**Evel KNIEVEL and Krystal Knievel, Plaintiffs,**

**v.**

**ESPN, INC., Defendant.**

**CV 01–69–BU–DWM.**

United States District Court,
D. Montana,
Butte Division.

Oct. 8, 2002.

---

9. Docket number 29.

10. Docket number 22.

11. Docket number 57.

Wade J. Dahood, Bernard J. "Ben" Everett, Knight, Dahood, McLean & Everett, Anaconda, MT, for Plaintiffs.

Peter Michael Meloy, Jennifer S. Hendricks, Meloy Law Firm, Helena, MT, Nathan Siegel, ABC, Inc., Washington, DC, for Defendant.

## ORDER

MOLLOY, Chief Judge.

### I. Statement of Facts

Plaintiff Evel Knievel is a well-known motorcycle daredevil who was born and raised in Butte, Montana. Throughout the 1970s and 1980s, Evel Knievel wowed fans throughout the United States and around the world with death-defying leaps over cars, trucks, bodies of water, and canyons. Although not in the spotlight as much as during his heyday, Evel Knievel remains a sports celebrity and is often referred to as the father of "extreme sports." Accordingly, Evel Knievel is considered a public figure who often signs autographs for children and adults and who allows himself to be photographed by fans and media.

At the time of the events giving rise to this action, Plaintiff Krystal Knievel was

married to Evel Knievel. On April 7, 2001, Evel and Krystal Knievel attended the ESPN Action Sports and Music Awards (the Awards) in Las Vegas, Nevada. At the Awards, celebrities in attendance were asked to have their pictures taken. Many celebrities consented, including Evel Knievel. Some of the pictures were posted on the website "expn.com" in what was called the "Green Carpet Gallery" (the Gallery).

The Gallery contained 17 pictures of celebrities taken at the Awards, each with a caption underneath. To access the Gallery, it was necessary to click on an icon that contained thumbnail pictures of five of the posted pictures. The language next to the icon stated, "Walk with the stars as they strut their stuff for the paparazzi." Clicking on the icon opened a window which contained the first photo in the Gallery. The viewer had the option to view all pictures in order by selecting the "next" option, or in reverse order by selecting the "back" option. However, the viewer could not look at a particular photo without first looking at the photos preceding it.

Beginning with the first photo and continuing in order, the photos and captions are described as follows:

The first photo in the Gallery shows two men, one has his left arm around the other and their right hands are clasped in a form of a handshake. The caption reads, "Colin McKay and Cary Hart share their love."

The second photo shows two men standing side-by-side with the caption, "Ben Harper and James Hetfield exchanging musical ideas, as James reminds Ben that if he's ever interested in doing something. . . ."

The third photo shows two men posing. The caption reads, "Xhibit and Busta discuss their pre-partying before throwing down a pose."

The fourth photo shows a woman in a black dress and shawl holding a rose. The caption state, "Tara Dakides lookin' sexy, even though we all know she is hardcore."

The fifth photo shows three men standing side-by-side, each holding a beer, with the caption, "Brian Deegan and the Metal Mulisha put back a few before going inside."

The sixth photo shows two women smiling and contains the caption, "Shannon Dunn and Leslee Olson make it look easy to be cheesy."

The seventh photo shows a man and a woman, apparently with their arms around one another. The caption states, "Todd Richards tells the camera man to step off his lady."

The eighth photo shows a man in sunglasses and has the caption, "Ben Hinkley rocks the shades so the ladies can't see him scoping."

The ninth photo shows a man and a woman with their arms around one another. The caption reads, "Dave Mirra and his gal know that he's the best."

The tenth photo shows Evel Knievel and is described below.

The eleventh photo shows a man on a non-motorized scooter. The caption states, "LL Cool J rolls in on a scooter and stops to give a shout out to EXPN."

The twelfth photo shows a man holding up two fingers in the "peace" gesture. The caption states, "B Real. Peace out."

The thirteenth photo shows two men, one with his right arm around the other. The caption says, "Bob Burnquist brought his skateboard along just in case he had time to get in a quick session."

The fourteenth photo shows a man in a suit and tie with the caption, "Kevin

Jones in a suit? You knew this show was going to be serious."

The fifteenth photo shows a man in a tie with a scowl on his face. He has his right arm around a woman in a low-cut black dress. The caption reads, "Bjorn Leines got tough with anyone whose eyes drifted south."

The sixteenth photo shows a woman and has the caption, "Ali Landry, aka "The Doritos Girl" won EXPN.com's award for Hottie of the Year."

The seventeenth photo shows a woman in a black tank-top with the caption, "Pose for papa … a close second for Hottie of the Year award."

Regardless of whether a viewer looked at the photos from first to last or last to first, the picture of Plaintiffs appeared in the middle of the Gallery. The photo shows Evel Knievel standing between two ladies, one of whom is Krystal Knievel, with his right arm around Krystal Knievel and his left arm around the other woman. The caption underneath the picture states: "Evel Knievel proves that you're never too old to be a pimp." Due to its position in the Gallery, access to it alone was not possible. To see the picture, a viewer needed to start with the first picture and view each of the first nine pictures or proceed in reverse order and view the last seven photos.

Evel and Krystal Knievel filed suit against Walt Disney, Inc. and ESPN in Montana State Court alleging defamation under Montana law. Defendants removed the action to this Court and the parties subsequently agreed to dismiss Walt Disney, Inc. as a defendant. Now pending is Defendant ESPN's motion to dismiss. ESPN argues that no reasonable person would believe the caption underneath the picture of Evel Knievel was alleging that Evel Knievel is actually a pimp or that Krystal Knievel is involved in prostitution. After considering the briefs and the evidence submitted by the parties, the Court agrees with ESPN. The website was obviously directed at a younger audience and contained loose, figurative, slang language such that a reasonable person would not believe ESPN was actually accusing Plaintiffs of being involved in criminal activity.

## II. Analysis

### A. Consideration of Documents Outside of the Pleadings

■ A threshold issue the Court must decide is whether the contents of the website may be considered in ruling on ESPN's motion to dismiss. Generally, a court must decide a motion to dismiss by looking at the face of the complaint. The incorporation by reference doctrine allows a court to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 986 (9th Cir.1999) (internal quotations and citation omitted). This doctrine allows a court to consider documents beyond the pleadings without converting the motion to dismiss to a motion for summary judgment. *Van Buskirk v. CNN,* 284 F.3d 977, 980 (9th Cir.2002).

■ Here, the contents of the expn.com website are at the center of Plaintiffs' allegations. The website is mentioned in the complaint and copies of some of the pictures are attached to the complaint. While the complete website was not attached to the complaint, Plaintiffs do not question the authenticity of the CD-rom containing the photos from the Gallery that was attached as an exhibit to ESPN's motion to dismiss. Accordingly, it is appropriate for the Court to look beyond the pleadings in this matter and consider the contents of the website in ruling on ESPN's motion to dismiss.

## B. Standard of Review

Under Fed.R.Civ.P. 12(b)(6), a complaint should not be dismissed unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Tanner v. Heise,* 879 F.2d 572, 576 (9th Cir.1989). The court must accept all allegations of material fact as true, *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), and construe the pleading in the light most favorable to the nonmoving party. *Tanner,* 879 F.2d at 576. "A complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff relies on a different legal theory." *Haddock v. Board of Dental Examiners of California,* 777 F.2d 462, 464 (9th Cir.1985).

■ A motion to dismiss under Rule 12(b)(6) is an appropriate device for determining whether Plaintiffs state a libel claim or whether the statement is non-actionable under the First Amendment. *Cochran v. NYP Holdings, Inc.,* 58 F.Supp.2d 1113, 1120 (C.D.Cal.1998), *affirmed* and reasoning adopted, 210 F.3d 1036 (9th Cir.2000). While existence of defamatory meaning is usually a fact question for the jury, "a court may properly determine whether a statement is fairly susceptible of a defamatory meaning when presented with a motion to dismiss." *Cochran,* 58 F.Supp.2d at 1120. When deciding the motion to dismiss, the Court is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning.... Just as the court must refrain from a 'hair-splitting analysis' of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find 'a defamatory meaning which the article does not convey to a lay reader.'

*Church of Scientology v. Flynn,* 744 F.2d 694, 696 (9th Cir.1984).

## C. Analysis of Prior Case Law

■ While defamation is primarily a creature of state law, "the First Amendment safeguards for freedom of speech and press limit state law." *Underwager v. Channel 9 Australia,* 69 F.3d 361, 366 (9th Cir.1995). To defend against the motion to dismiss, Plaintiffs "must show that the statement is reasonably capable of sustaining a defamatory meaning, and is not comment within the ambit of the First Amendment." *Cochran,* 58 F.Supp.2d at 1121.

In *Milkovich v. Lorain Journal Co.,* the United States Supreme Court determined that "opinion" does not fall under a separate constitutional protection, but falls under the same First Amendment umbrella as other forms of speech. 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In its opinion, the Supreme Court recognized that a line of cases including *Greenbelt Cooperative Publishing Association, Inc. v. Bresler, Old Dominion Branch No. 496, National Association of Letter Carriers, AFL CIO v. Austin,* and *Hustler Magazine v. Falwell* provides protection for statements that cannot reasonably be interpreted to state actual facts about an individual. *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (internal quotations and citation omitted).

In *Greenbelt,* a developer sued the publisher of a newspaper after the newspaper published articles reporting that some people characterized the developer's negotiating tactics as "blackmail." The developer argued that the term "blackmail" implied that the developer had committed the crime of blackmail. 398 U.S. 6, 7–8, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). The Supreme Court rejected the developer's argument, holding that the term "blackmail" was not slander when spoken and not libel when reported because "even the most

careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. 1537.

Likewise, in *Letter Carriers*, the Supreme Court held that use of the word "traitor" in a union organizing newsletter's definition of the word "scab" was not actionable. 418 U.S. 264, 286–87, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). The Supreme Court noted that in the context of union organizing efforts, use of the word "traitor" could not be construed as a representation of fact and that it was "impossible to believe" that anyone would believe the newsletter was charging non-union workers with the crime of treason. *Id.* at 284–85, 94 S.Ct. 2770. Rather, the Supreme Court determined that words in the newsletter such as "traitor" were "obviously used . . . in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization." *Id.* at 285, 94 S.Ct. 2770. *See also Hustler Magazine*, 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (Ad parody "could not reasonably have been interpreted as stating actual facts about the public figure involved;" therefore, state emotional distress action precluded by the First Amendment).

Based on *Milkovich* and the *Greenbelt–Letter Carriers–Falwell* trilogy, the Ninth Circuit has set forth a three-part totality of circumstances analysis to determine whether a statement implies a factual assertion. First, the Court must consider "the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." Next, the Court must look at "the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." Finally, the Court must consider "whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Underwager*, 69 F.3d at 366.

In *Cochran v. NYP Holdings, Inc.*, attorney Johnnie Cochran brought a libel action against the New York Post Holding Company, owner of the New York Post (the Post), and Andrea Peyser, author of a column published in the Post. Peyser's column was a commentary about Cochran's role in the O.J. Simpson trial and the "imminent joinder" of Cochran onto the legal team representing Abner Louima, the Haitian immigrant tortured by police officers in New York City. Peyser's column took a dim view of Cochran's role in the O.J. Simpson saga and the affect he would have on Louima's case. The column was fairly scathing, however, Cochran took issue only with the portion which stated:

> Cochran has yet to speak up. But history reveals that he will say or do just about anything to win, typically at the expense of the truth.

58 F.Supp.2d at 1116.

Cochran's libel action alleged that the statement, when read with the entire column, implied that Cochran's representation of O.J. Simpson involved lying and unethical conduct. *Id.* at 1117. The Post and Peyser moved to dismiss arguing that Peyser's statement in her column was non-actionable because it could not reasonably be read to imply an assertion of objective fact. *Id.* at 1116. As a threshold question, the District Court for the Central District of California determined that the statement in Peyser's column was reasonably capable of sustaining the meaning Cochran claimed, or that he made up the conspiracy theory to get O.J. Simpson acquitted. *Id.* 1120–21.

In applying the three-part test, however, the district court concluded that Cochran failed to allege a defamatory statement and could not bring a claim for defamation. In applying the three-part test, the district court first concluded that in the broad context of the column, Peyser's statement "[could not] reasonably be understood as anything more than Peyser weighing in on the public debate over the Louima case and its impending collision with the Simpson saga, which she apparently hopes to avert." *Id.* at 1123. Key to the district court's decision was that Peyser's column appeared in the first five pages of the Post, pages which usually contain opinion columns; Peyser was a regular columnist known for her "very opinionated" columns; the column was formatted as an opinion piece rather than a news article, as Peyser's picture and name were in large, bold letters, which highlighted her "persona" over the column itself; and, finally, the headline and captions under two photos did not simply communicate information, but supplied comment. *Id.*

Next, the district court determined that the specific context of the statement within the article was "a collection of opinions, colorfully expressed, which renders the statement at issue simply more rhetorical hyperbole." *Id.* at 1124. The district court concluded that Peyser's language was "loose, figurative and hyperbolic" and "convey[ed] nothing more substantive than Peyser's contempt for Cochran and his trial tactics." *Id.* Additionally, the district court noted that "the audience for this column would reasonably expect the alleged defamatory statement to constitute Peyser's opinion, tucked in as it is, among numerous other statements of opinion in a recognizable opinion column." *Id.* at 1125.

Finally, the district court determined that the statement was not susceptible to being proven true or false because it could not be read as anything more than "a comment on Cochran's trial strategy." *Id.* at 1125. The district court determined that an attorney's trial strategy, unlike an allegation of perjury, cannot be proven true or false "because there is no core of objective evidence" upon which to verify the allegation. *Id.* Ultimately, the district court determined that a reasonable fact finder could not find the statement was sufficiently factual to be proven true or false. Thus, the district court held that Cochran failed, as a matter of law, to allege a defamatory statement and granted Defendants' motion to dismiss. *Id.* at 1126.

## D. Alleged Libel of Evel and Crystal Knievel

ESPN maintains that the caption underneath the picture of the Knievels cannot be reasonably interpreted as alleging that Evel Knievel is a pimp or that Krystal Knievel is a prostitute. Defendant notes that the photo was one of many in a group with tongue-in-cheek captions that were not meant to be taken literally.

Plaintiffs counter that use of the word "pimp" charges Evel Knievel with a criminal offense. Plaintiffs also assert that by implication, Krystal Knievel is being accused of being a prostitute. Plaintiffs argue that the caption is not humorous, bears a defamatory meaning, constitutes libel per se, and is actionable on its face. Plaintiffs also contend that the Court cannot grant ESPN's motion to dismiss because Article II, Section 7 of the Montana Constitution provides that the jury shall decide the facts and the law in a libel action.

The dispositive issue in this case, then, is whether a reasonable person would construe the photo caption as charging Evel or Krystal Knievel with a criminal offense. Based on the case law set forth above, the Court must apply a three-part

test, considering the broad context in which the photo and caption appeared, the specific context and content of the photo and caption, and whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Underwager*, 69 F.3d at 366.[1]

### 1. Broad Context

The general tone of the expn.com website and the Green Carpet Gallery was one of tongue-in-cheek humor and slang that was not meant to be taken seriously. The main page for the Action Sports and Music Awards photo galleries has links to three galleries other than the Green Carpet Gallery. The first, which is near the top of the main page, has thumbnails of five photos and the description "Go ahead and choke on all of these." The next link has five thumbnails and states, "Kickin' it for much flavor, for you and yours." Other links on the main page have descriptions such as "Ladies lookin' good," "Dudes rollin' deep," "Can't Get Enough Gallery: Bring the ruckus," "Fashion Gallery: Check out what the rock stars and prom queens were wearing," and "Scene Gallery: The behind the scenes look at all the cool kids, EXPN style."

"EXPN style" may best describe the broad context of the website. The portion of the expn.com website in which the photo of Plaintiffs appeared was dedicated to the Action Sports and Music Award show. While the website could be accessed by any person with a computer regardless of age or location, the design and language used make it obvious that the target audience is teenagers and young adults who are likely to use many of the terms on the website in everyday conversation.

### 2. Specific Context

"The specific context of a statement shades its meaning." *Cochran*, 58 F.Supp.2d at 1123. Language that is "loose, figurative and hyperbolic ... tends to negate the impression that a statement contains an assertion of verifiable fact." *Id.* (internal quotations and citation omitted).

■ The caption under the photo of Plaintiffs appeared among a number of other photos using similar loose, figurative slang language. Surrounding the use of the word "pimp" was the use of words and phrases such as "share the love," "throwing down a pose," "hardcore," and "hottie." Also used were phrases such as "step off," apparently meaning leave alone; "give a shout out," meaning greet; and "put a few back," referring to drinking beer. In this context, no reasonable person would believe the caption under the photo of Plaintiffs was accusing Evel Knievel of actually being a pimp, but would understand that pimp is being used in a figurative sense.

Plaintiffs argue that the defamatory meaning of the term prescribed by them is not unreasonable, as many other photos in the Green Carpet Gallery contained captions with "factual assertions." In this sense, Plaintiffs argue that because other photos had "factual assertions," it is not unreasonable for someone to believe that "pimp" was being used to assert for a fact that Evel Knievel is a pimp.

Plaintiffs are correct that a pimp can be "a man who solicits customers for a prostitute or a brothel, usually in return for a share of the proceeds," and that being a pimp is illegal under Montana law. How-

**1.** As a threshold issue, the Court must determine whether the term "pimp" is capable of holding the defamatory meaning ascribed to it by Plaintiffs. *Cochran*, 58 F.Supp.2d at 1120. The Court concludes that use of the term

pimp is capable of the meaning of prescribed by Plaintiffs: that Evel and Krystal Knievel were involved in criminal activity involving prostitution.

ever, the definition of the word assigned by Plaintiffs is not the only definition. In slang commonly used today, calling someone a pimp is not necessarily an insult and can be a compliment. For example, The Online Slang Dictionary notes that pimp can be used as an insult, but can also mean "cool." *See* The Online Slang Dictionary, at **http://www.ocf.berkeley.edu/ wrader/slang/p.html# top** (visited July 29, 2002). *See also* **http://www.slangsite.com/slang/P.html** (visited July 29, 2002) (defining "pimp" variously as "when complimenting a person on their mastery of the subject matter;" "a headhunter, recruiter, or account executive;" "a cigarette filled with tobacco or anything else you can smoke;" and to "plug, promote").

While Plaintiffs are correct that their prescribed meaning is not unreasonable, this assertion misses the point. In First Amendment jurisprudence, it is not the meaning prescribed by or the effect on the listener that controls. *See e.g. Hustler Magazine*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (holding First Amendment does not permit emotional distress claim for ad parody); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("Speech doe not lose its protected character ... simply because it may embarrass others or coerce them into action"); *FCC v. Pacifica Foundation*, 438 U.S. 726, 745, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it"); and *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) ("It is firmly settled that ... the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers").

Plaintiffs seek to justify their cause of action by prescribing the meaning they wish to the term "pimp." This is not the standard by which a libel action is mea-

sured. If it were, a defamation action would lie any time a person was offended by a term that could have a negative meaning. That a term is capable of having a defamatory meaning, it does not necessarily follow that the meaning is reasonable when considered in the context in which it was uttered. Whether a term is capable of holding a prescribed defamatory meaning is a threshold inquiry. The issue is whether, in the abstract, the prescribed meaning is reasonable. But, like in *Cochran*, the abstract meaning can change when put in a particular context. In *Cochran*, Peyser's comments could be defamatory when considered on their own. However, in context of the article, the defamatory meaning did not hold.

Here, the situation is no different. While calling someone a pimp is, in the abstract, capable of defamatory meaning, the term loses that meaning when considered in the context presented here. The picture of Plaintiffs was in the middle of the Gallery, meaning a viewer had to click through numerous other pictures with similar figurative, slang captions in order to access the picture. The website was directed at a younger audience, and the tone was "loose, figurative and hyperbolic." In light of this context, no reasonable person would believe the expn.com website was accusing Evel Knievel of being a pimp or of soliciting prostitution.

### 3. Susceptibility of Being Proven True or False

While a person's status as a pimp can be proven true or false, that is not the issue in this case because a reasonable person would not believe Evel Knievel was being called a pimp in the criminal sense. The issue, then, is whether a person is a "pimp" in the slang sense is capable of being proven true or false. As the slang dictionaries show, "pimp" can mean differ-

ent things, both good and bad. Under any definition, however, a subjective determination is involved and it cannot be proven true or false. Calling someone a pimp in the slang sense is like saying someone is "bad" or "good": it necessarily depends upon the subjective analysis of the person making the statement. Like trial strategy in *Cochran*, a slang term such as pimp implicates a subjective evaluation that is not capable of being proven true or false.

### E. Applicability of the Montana Constitution

Plaintiffs argue that the Court cannot decide this case on ESPN's motion to dismiss because the Montana Constitution requires a jury to determine the facts and the law. The Montana Constitution provides that

> [n]o law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty. In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and *the jury, under the direction of the court, shall determine the law and the facts.*

Mont. Const. Art. II, Sec. 7 (*emphasis* added).

The Montana Supreme Court recently addressed the meaning of this provision in *Hale v. City of Billings*, 295 Mont. 495, 986 P.2d 413 (1999). Relying on the Restatement (Second) of Torts, the Montana Supreme Court determined that Article II, Section 7 is not to be read literally. It is up to the jury to determine whether a statement is true or false, unless "the evidence is so overwhelming that any other conclusion would be unreasonable." *Hale*, 295 Mont. at 500, 986 P.2d at 417. In the latter case, a court may make "a proper finding." *Id.* Additionally, as a preliminary matter, a court "must determine

whether a communication is capable of bearing a particular meaning and whether the meaning is defamatory." *Id.* (internal quotations and citation omitted). Thus, as interpreted by the Montana Supreme Court, the language in Article II, Section 7 means that absent compelling evidence that any other conclusion would be unreasonable, the truth or falsity of a statement is within the sole province of the jury.

Applying *Hale* to this case, Article II, Section 7 does not prevent the Court from granting ESPN's motion to dismiss. The truth or falsity of the statement is not at issue. The determinative issue is whether the communication is capable of bearing a particular meaning and whether that meaning is defamatory. As the Montana Supreme Court recognized, this is a preliminary issue that must be determined by the Court. *Hale*, 295 Mont. at 500, 986 P.2d at 417.

As discussed above, the compelling evidence mandates the conclusion that, in the context of the expn.com website, no person would reasonably believe that the caption under the photo of Plaintiffs was meant to accuse Evel Knievel of being a pimp or Krystal Knievel of being a prostitute. Article II, Section 7 does not prevent a ruling in ESPN's favor. Further, even if the Montana Constitution barred granting ESPN's motion to dismiss, the First Amendment controls. As discussed above, because the caption cannot reasonably be interpreted as accusing Evel Knievel of criminal activity, the First Amendment requires dismissal. The Montana Constitution must yield to the First Amendment and cannot undermine this result.

### III. Conclusion

Because a reasonable person would not believe the caption under the photo of Plaintiffs was accusing Evel Knievel of being a pimp in the criminal sense, Plaintiff Evel Knievel's claims against ESPN

must be dismissed. Based on the foregoing conclusion, a reasonable person could not conclude that the caption was implying Krystal Knievel is a prostitute and her claims against ESPN must be dismissed, as well.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss (dkt # 12) is GRANTED.