**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EVEL KNIEVEL; KRYSTAL KNIEVEL,
            *Plaintiffs-Appellants,*

v.

ESPN, a subsidiary of Walt
Disney, Inc.,
            *Defendant-Appellee.*

No. 02-36120

D.C. No.
CV 01-069 DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
May 5, 2004—Seattle, Washington

Filed January 4, 2005

Before: A. Wallace Tashima, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Bea

27

**COUNSEL**

Wade J. Dahood, Knight, Dahood, Everett & Sievers, Ana-
conda, Montana, for the plaintiffs-appellants.

Nathan Siegel, ABC, Inc., Washington, D.C., for the
defendant-appellee.

**OPINION**

TASHIMA, Circuit Judge:

Famed motorcycle stuntman Evel Knievel and his wife
Krystal were photographed when they attended ESPN's
Action Sports and Music Awards in 2001. The photograph
depicted Evel, who was wearing a motorcycle jacket and rose-
tinted sunglasses, with his right arm around Krystal and his
left arm around another young woman. ESPN published the
photograph on its "extreme sports" website with a caption that
read "Evel Knievel proves that you're never too old to be a
pimp." The Knievels brought suit against ESPN in state court,
contending that the photograph and caption were defamatory
because they accused Evel of soliciting prostitution and

implied that Krystal was a prostitute. ESPN removed the action to federal court and moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The court granted ESPN's motion on the ground that the photograph and its caption were not defamatory as a matter of law. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

Evel's career as a daredevil began in 1965, when he toured the United States performing motorcycle stunts such as riding through fire walls, jumping over live rattlesnakes and mountain lions, and being towed at 200 miles an hour behind race cars holding on to a parachute. As Evel's reputation grew, so did the danger of his stunts. In 1968, he spent 30 days in a coma after an unsuccessful attempt to jump 151 feet across the fountains in front of Caesar's Palace in Las Vegas. Evel continued to perform daring jumps on his motorcycle, setting a world record in 1971 when he cleared 19 Dodge cars. In 1973, Evel stunned a crowd of 35,000 in the Los Angeles Coliseum when he launched from a ski jump over 50 cars stacked atop one another. In 1974, keeping his promise to a fan, Evel risked his life on national television in an unsuccessful attempt to clear the Snake River Canyon in Idaho on his rocket powered "Skycycle." His awe-inspiring attempt to jump over 14 Greyhound buses in 1975 continues to hold the ABC's Wide World of Sports TV viewing audience record with a whopping 52% of household share.[1]

Because of his distinguished career as a motorcycle daredevil, Evel Knievel has become one of the most recognized names in sports throughout the world. The Smithsonian Institute has dedicated a portion of its museum to honor his achievements, and at least seven books and four motion pictures have been dedicated to his life. Evel enjoys an excellent reputation in his community as a humanitarian and an advo-

---

[1]*See* http://www.evelknievel.com (last visited July 20, 2004).

cate for the well-being of young people, and he has used his fame and notoriety to promote anti-drug programs and motorcycle safety. He has also served as a spokesperson for several prominent corporations, including clothing manufacturer Tommy Hilfiger and tire makers Firestone and Bridgestone.

In April 2001, ESPN held its Action Sports and Music Awards ceremony, at which celebrities in the fields of extreme sports and popular music such as rap and heavy metal converged. Well-known musicians Ben Harper and James Hatfield were there, as were popular rappers Busta Rhymes and LL Cool J. Evel, who is commonly thought of as the "father of extreme sports," was in attendance with Krystal. ESPN arranged to have many of the celebrities in attendance photographed, including the Knievels. In one photograph, Evel is flanked on his right by his wife and on his left by an unidentified young woman. He has one arm around each woman and he wears rose-tinted sunglasses and a motorcycle jacket.

ESPN published the photograph of the Knievels on the "Green Carpet Gallery" portion of its "EXPN.com" website. The EXPN.com site features information and photographs relating to "extreme" sports such as skateboarding, surfing, and motorcycle racing. The "Green Carpet Gallery" portion of the site documents the celebrities that attended ESPN's Action Sports and Music Awards. When a viewer clicks on the Green Carpet Gallery icon, he or she is directed to a photograph of two men grasping hands, which is accompanied by a caption that reads "Colin McKay and Cary Hart share the love." From there the viewer can click the "next" icon to scroll through the remaining photographs sequentially. There are 17 photographs in all, each featuring one or more celebrities, and each accompanied by a caption. One shows a woman in a black dress, and is accompanied by a caption that reads "Tara Dakides lookin' sexy, even though we all know she is hardcore." Another shows a man with sunglasses, and is accompanied by the caption "Ben Hinkley rocks the shades so the ladies can't see him scoping." The photograph of the

Knievels is the tenth in the sequence, and it cannot be viewed without first viewing the nine photographs preceding it. Its caption reads "Evel Knievel proves that you're never too old to be a pimp."

The Knievels allege that in publishing the photograph and caption on its website, ESPN intended to charge Evel with "immoral and improper behavior" and bring him and his wife into "public disgrace and scandal." They allege that the photograph and caption, which were posted on ESPN's website for approximately six days, "exposed [them] to hatred, contempt, ridicule and obloquy that caused [them] to be shunned and avoided and maliciously injured the reputation of Evel Knievel." And because of the photograph and its caption, they allege, several of Evel's former clients do not want him associated with their product.

ESPN moved to dismiss the Knievels' complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that the First Amendment precludes its liability for defamation because no reasonable person would have interpreted the caption as an allegation that Evel was a "pimp" in the criminal sense. The district court agreed and granted the motion, reasoning that "the website was obviously directed at a younger audience and contained loose, figurative, slang language such that a reasonable person would not believe ESPN was actually accusing Plaintiffs of being involved in criminal activity." The Knievels moved to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e), but the motion was denied.

The Knievels then noticed this appeal.[2] They contend that

---

[2]The Knievels' notice of appeal does not reference the underlying order dismissing their claims, but only the order denying their motion to alter or amend the judgment. Ordinarily a notice of appeal must designate the order that is being appealed. Fed. R. App. P. 3(c)(1)(B). We have permitted parties to litigate an order not listed in the notice of appeal, however, where (1) the intent to appeal that order can be "fairly inferred" and (2)

the Montana Constitution guarantees them a jury trial on their
defamation claim, and that the district court erred as a matter
of law when it dismissed the action.

## II.

We review the district court's grant of a motion to dismiss
*de novo*. *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th
Cir. 2003). When ruling on a motion to dismiss, we accept all
factual allegations in the complaint as true and construe the
pleadings in the light most favorable to the nonmoving party.
*Id.*

We review the district court's interpretation of Montana
law *de novo*. *Marcy v. Delta Airlines*, 166 F.3d 1279, 1282
(9th Cir. 1999). In interpreting Montana law, we must follow
the decisions of Montana's highest court. *See Olympic Sports
Prods., Inc. v. Universal Athletic Sales Co.*, 760 F.2d 910,
912-13 (9th Cir. 1985). We review *de novo* the court's ruling
that the statement was not defamatory as a matter of law.
*Steam Press Holdings, Inc. v. Haw. Teamsters & Allied Work-
ers Union Local 996*, 302 F.3d 998, 1005 (9th Cir. 2002).

## III.

### A.   Montana Law Does Not Entitle the Knievels to a Jury Trial

The Montana Constitution provides that "[i]n all suits and
prosecutions for libel or slander the truth thereof may be

---

the appellee was not prejudiced by the mistake. *Lolli v. County of Orange*,
351 F.3d 410, 414 (9th Cir. 2003). The Knievels made it clear in their
opening brief that they intended to appeal the order dismissing the action,
not merely the denial of their motion to alter or amend the judgment.
ESPN was not prejudiced by the Knievels' failure to identify the order dis-
missing the action because the Knievels addressed the merits of their
claim in their opening brief, ESPN didn't bring the oversight to our atten-
tion, and ESPN addressed the merits in its brief as well. *See McCarthy v.
Mayo*, 827 F.2d 1310, 1314 (9th Cir. 1987). Therefore, we interpret the
Knievels' notice of appeal as an appeal of the underlying order.

given in evidence; and the jury, under the direction of the court, shall determine the law and the facts." Mont. Const. art. II, § 7. The Knievels interpret this provision to mean that they are entitled to a jury trial because they have a "special constitutional right in a libel and slander case in Montana" that guarantees them their "fair day in court." But Montana's highest court, which we are bound to follow, interprets the provision differently.

**[1]** The Montana Supreme Court has repeatedly affirmed the ability of judges to dispose of defamation claims where there are no issues of fact warranting a jury trial. *Hale v. City of Billings*, 986 P.2d 413, 418 (Mont. 1999) (holding that whether a statement is "capable of bearing a defamatory meaning" is an issue that "a court can and should rightfully determine upon a motion for summary judgment"); *Small v. McRae*, 651 P.2d 982, 994-95 (Mont. 1982) (holding that it is "clearly settled" that "where there is a failure to establish an essential element of the [defamation] cause of action, the case becomes one of law for the Court"); *Griffin v. Opinion Publ'g Co.*, 138 P.2d 580, 586 (Mont. 1943) (holding that notwithstanding the ambiguous language of the Montana Constitution "it is for the court and not the jury to pass upon demurrers to the complaint"), *overruled on other grounds by State v. Helfrich*, 922 P.2d 1159, 1161 n.1 (Mont. 1996).

> While our Constitution like that of Missouri, Colorado, South Dakota and Wyoming provides that in libel suits 'the jury, under the direction of the court, shall determine the law and the facts,' yet the decisions clearly show that the function of the court and jury is not greatly different in the trial of libel from what it is in other cases.

*Griffin*, 138 P.2d at 586. The Knievels' argument that they are entitled to a jury trial is untenable in light of the Montana Supreme Court cases to the contrary.

The Knievels point to *Hale*'s pronouncement that "[u]nless the evidence is so overwhelming that any other conclusion would be unreasonable, the issue of whether the statements were true or false is a determination for the jury alone to make." *Hale*, 986 P.2d at 417-18 (internal quotation marks omitted). But that language does nothing more than point out that where there is a disputed issue of fact as to the truth or falsehood of a statement, that disputed issue of fact must be submitted to the jury. It does not stand for the proposition that questions of law or *undisputed* questions of fact must be submitted to a jury. *Hale*, like the cases before it, recognized that courts can rule on whether a statement is capable of a defamatory meaning as a matter of law.

Even if the Montana Constitution did establish a rule that defamation plaintiffs are entitled to a jury trial in state court, that rule would not bind a federal court exercising its diversity jurisdiction. Under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity must apply the Federal Rules of Civil Procedure. *Hanna v. Plumer*, 380 U.S. 460, 470-71 (1965) ("The *Erie* rule has never been invoked to void a Federal Rule [of Civil Procedure].");*see also Herron v. S. Pac. Co.*, 283 U.S. 91, 94-95 (1931) (holding that a state law requiring the jury to decide the issue of contributory negligence cannot interfere with authority of a federal court to direct a verdict where there are no facts in dispute). And as every trial lawyer knows, federal courts may decide cases as a matter of law where the complaint fails to allege facts sufficient to state a claim upon which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6).

## B. The Photograph and Caption Were Not Defamatory as a Matter of Law

In enforcing laws that impose liability for mere speech, a right explicitly guaranteed to the people in the United States Constitution, states tread perilously close to the limits of their authority. Courts have acknowledged the tension between def-

amation claims and the First Amendment's protection of speech, and held that when reviewing state-law cases that raise First Amendment issues, appellate courts must "make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)); *see also Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) ("Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law.").

**[2]** In order to survive ESPN's motion to dismiss, the Knievels must not only establish that the photograph and caption about which they complain are "reasonably capable of sustaining a defamatory meaning," *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1121 (C.D. Cal. 1998), *aff'd and reasoning adopted*, 210 F.3d 1036, 1038 (9th Cir. 2000), they must also show that they are not mere "comment within the ambit of the First Amendment." *Id.* We can resolve both questions as a matter of law. *Id.* at 1120; *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1065-68 (9th Cir. 1998) (dismissing action for failure to state a claim because statements were non-actionable opinion); *Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1415 (C.D. Cal. 1987) ("It is for the court to decide [whether a statement is actionable defamation] in the first instance as a matter of law."), *aff'd*, 867 F.2d 1188, 1193-94 (9th Cir. 1989).

**[3]** When evaluating the threshold question of whether a statement is reasonably capable of sustaining a defamatory meaning, we must interpret that statement "from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made." *Norse v. Henry Holt & Co.*, 991 F.2d 563, 567 (9th Cir. 1993) (citation omitted). In *Norse*, we held that a biographer's statement that plaintiff, poet Harold Norse, "thought of himself as 'darkhorse Norse,' ignored and unpublished," was not reasonably

capable of a defamatory meaning in the context in which it appeared. Norse argued that the sentence implied that he was not published at the time. We disagreed, holding that the essence of the sentence was not that Norse was unpublished, but rather that Norse felt snubbed by the literary community. "In context," we held, "the word 'unpublished' does not mean literally that Norse had never published before 1963. Rather, it reflects Norse's own perception of himself as an artist who was unfairly neglected and ignored, a poet who believed that he was not as successful as he deserved to be in his publishing efforts at that stage in his career." *Id.*

The same reasoning applies in this case. Although the word "pimp" may be reasonably capable of a defamatory meaning when read in isolation, we agree with the district court's assessment that "the term loses its meaning when considered in the context presented here." As discussed in more detail herein, the term "pimp" as used on the EXPN.com website was not intended as a criminal accusation, nor was it reasonably susceptible to such a literal interpretation. Ironically, it was most likely intended as a compliment. But we need not definitively resolve that issue here because even if the photograph and caption are reasonably capable of a defamatory meaning, they are not actionable under the First Amendment.

**[4]** The First Amendment protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)). Courts have extended First Amendment protection to such statements in recognition of "the reality that exaggeration and non-literal commentary have become an integral part of social discourse." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997). By protecting speakers whose statements cannot reasonably be interpreted as allegations of fact, courts "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the

discourse of our Nation." *Milkovich*, 497 U.S. at 20 (quoting *Falwell*, 485 U.S. at 53-55).

**[5]** When determining whether a statement can reasonably be interpreted as a factual assertion, we must examine the "totality of the circumstances in which it was made." *Underwager*, 69 F.3d at 366.

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Id.* The context in which the statement appears is paramount in our analysis, and in some cases it can be dispositive. *See Dworkin*, 867 F.2d at 1193 (holding that courts must "examine the facts surrounding the publication, the context in which the statements were made, and the nature of the language used"); *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) ("Context does resolve the matter.").

**[6]** Because the reasonable interpretation of a word can change depending on the context in which it appears, not all statements that could be interpreted in the abstract as criminal accusations are defamatory. In *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970), newspaper articles reporting on the contents of a public meeting regarding a pending development permit stated that some people at the meeting characterized the developer's negotiating position as "blackmail." *Id.* at 7. The developer recovered in state court for libel on the ground that the articles accused him of the crime of blackmail. The Supreme Court reversed, holding that the statement

was protected First Amendment speech because "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the developer] with the commission of a criminal offense." *Id.* at 14. On the contrary, it held, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.*

**[7]** A speaker's use of "loose, figurative" language can also determine whether his or her statement can reasonably be interpreted as a factual allegation. In *Standing Comm. on Discipline of the United States Dist. Court v. Yagman*, 55 F.3d 1430 (9th Cir. 1995), we held that an attorney could not be sanctioned for accusing a district judge of being "dishonest" because the other terms the attorney used to describe the judge — "ignorant," "ill-tempered," "buffoon," "sub-standard human," and "right-wing fanatic" — made it clear that the attorney intended only to signal his general contempt for the judge, rather than to accuse him of corruption. *Id.* at 1440; *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (holding that the use of the word "traitor" could not be reasonably interpreted as a representation of fact because it was used "in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization"); *Cochran*, 58 F. Supp. 2d at 1124-25 (holding that a statement that suggested that defense attorney Johnnie Cochran lied and exhibited unethical conduct was not actionable as a matter of law because the statement appeared in an opinion column and the author used "loose, figurative, and hyperbolic" speech throughout the column). On the other hand, we held that Yagman could be sanctioned for accusing Judge Keller of being "drunk on the bench" because he made that accusation on a separate occasion and there was "nothing relating to the context in which this statement was made that tends to negate the

literal meaning of the words he used." *Yagman*, 55 F.3d at 1441.

1. *Taking Into Account Material Not Alleged in the Complaint*

In evaluating the context in which the statement appeared, we must take into account "all parts of the communication that are ordinarily heard or read with it." Restatement (Second) of Torts § 563 cmt. d (1977). In doing so, we deviate from the general rule that courts, when ruling on a motion to dismiss, must disregard facts that are not alleged on the face of the complaint or contained in documents attached to the complaint. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Our approach is permissible under the "incorporation by reference" doctrine, which permits us to take into account documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 2002) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)) (alteration in original). We have extended the "incorporation by reference" doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (holding that the district court properly considered documents attached to a motion to dismiss that described the terms of plaintiff's group health insurance plan, where plaintiff alleged membership in the plan, his claims depended on the conditions described in the documents, and plaintiff never disputed their authenticity); *see also Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (taking into account newspaper article containing allegedly defamatory statement under the "incorporation by reference" doctrine where it was "cen-

tral" to plaintiff's claim, defendant attached it to the motion for judgment on the pleadings, and plaintiff did not contest its authenticity). The rationale of the "incorporation by reference" doctrine applies with equal force to internet pages as it does to printed material. Just as a reader must absorb a printed statement in the context of the media in which it appears, a computer user necessarily views web pages in the context of the links through which the user accessed those pages.

The Knievels attached to their complaint only the photograph and caption that they argue was defamatory, and they do not allege or describe the contents of the surrounding pages in their complaint. ESPN argued below, and on appeal, that viewers accessing the website could not help but to see at least some of the surrounding web pages in order to view the photograph and caption that the Knievels allege to be defamatory. ESPN attached copies of the pages surrounding the Knievels photograph to its motion to dismiss and included a CD-ROM containing a digital replica of the relevant portions of the EXPN.com website in its supplemental excerpts of record on appeal. The Knievels do not dispute ESPN's contention that a viewer accessing the Knievels photograph must also access the surrounding pages on the EXPN.com website, nor do they dispute the authenticity of the materials and CD-ROM attached to ESPN's motion to dismiss. When browsing the CD-ROM, we found that in order to access the photograph, one must first view, at minimum, the nine photographs that precede it and the EXPN.com home page. Therefore, we take into account the web pages attached to ESPN's motion to dismiss under the "incorporation by reference" doctrine.

2. *The Use of "Loose, Figurative" Language*

**[8]** Our first inquiry is into the "broad context" of the statement, which includes "the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Underwager*, 69 F.3d at 366. The district court found, and we agree, that the content of the EXPN.com main page

is lighthearted, jocular, and intended for a youthful audience. It is equally clear that the subject matter of the page is not merely extreme sports themselves, but the youth culture and style associated with extreme sports. The page directs the viewer to "[c]heck out what the rockstars and prom queens were wearing," and offers a "behind the scenes look at all the cool kids, EXPN-style." Most importantly, however, we observe that the page features slang phrases such as "[d]udes rollin' deep"[3] and "[k]ickin' it with much flavor,"[4] neither of which is susceptible to a literal interpretation, and neither of which one would expect to hear uttered by anyone but a teenager or young adult. A reasonable viewer exposed to the main page would expect to find precisely that type of youthful, non-literal language on the rest of the site.

[9] Next, we examine the "specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Underwager*, 69 F.3d at 366. Again, the overwhelming presence of slang and non-literal language guides our inquiry. The web pages immediately preceding and following the Knievel photo use slang words such as "hardcore"[5] and "scoping,"[6] and slang phrases

---

[3]"Rollin' deep" means "[d]riving along in a cool car." http://www.voxcommunications.com/03rollindeep.htm (visited April 9, 2004).

[4]"Kick it" is a phrase used in rap music to mean "to give to (someone) or let (someone) have it." 2 J.E. Lighter, *Random House Historical Dictionary of American Slang* 349 (Random House 1997) ("*Random House Vol. II*"). "Kick flavor" means "to perform; to be entertaining." *Id.* at 774.

[5]"Hardcore" can have multiple meanings, depending on the context. *Compare Random House Vol. II*, at 31 (defining term to mean "unswervingly dedicated"); *with* http://www.slangsite.com/slang/H.html (visited April 16, 2004) (noting that the word "hardcore" can be "1. Used to describe anything [that is] cool or liable to hurt you 2. Used to describe a person that is into something more than everyone else, usually in a tough sense[, or] 3. Referring to music of the 'hardcore' genre").

[6]To "scope" is to evaluate a member of the opposite sex visually. Richard A. Spears, Ph.D., *NTC's Dictionary of American Slang and Colloquial Expressions* 333 (NTC Publishing Group 2d ed. 1995).

such as "throwing down a pose," "put a few back," and "hottie of the year,"**7** none of which is intended to be interpreted literally, if indeed they have a literal meaning at all. We think that any reasonable viewer would have interpreted the word "pimp" in the same loose, figurative sense as well.**8** *See Yagman*, 55 F.3d at 1440.

**[10]** But even if a viewer had interpreted the word "pimp" literally, he or she would have certainly interpreted the photograph and caption, in the context in which they were published, as an attempt at humor. *See Hustler Magazine Inc.*, 485 U.S. at 49 (holding that farcical interview published in pornographic magazine in which minister admits to a "drunken incestuous rendezvous" with his mother in an outhouse was not actionable because it "could not 'reasonably be understood as describing actual facts . . . or actual events in which [the minister] participated' "); *Polygram Records, Inc. v. Superior Court*, 216 Cal. Rptr. 252, 257 (Ct. App. 1985) (holding that an "obvious joke, told during an obvious comedy performance," was not defamatory as a matter of law). The "Green Carpet Gallery" pokes fun at many of the celebrities it portrays. One photograph features two women smiling, and is accompanied by the caption "Shannon Dunn and Leslee Olson make it look easy to be cheesy." Another depicts a man taking a step toward the camera, and is accompanied by the caption "Todd Richards tells the camera man to step off

---

**7**The term "hottie" refers to "an attractive or sexually promiscuous person of the opposite sex, usually a woman." *Random House Vol. II*, at 185.

**8**"Pimp" has traditionally meant a man in charge of prostitutes. *Webster's New World Dictionary* 1025 (2d ed. 1986) (defining "pimp" as "a man who is an agent for a prostitute or prostitutes and lives off their earnings."). But "[t]oday it's a very ambiguous term, used as either a compliment or an insult towards a male. In its positive form, it means that the person is 'cool.' In its negative form, it insults their attitudes, clothing, or general behavior." http://www.ocf.berkeley.edu/~wrader/slang/p.html (visited April 9, 2004); *see also* http://www.slangsite.com/slang/P.html (visited April 16, 2004) (noting that the term "pimp" can also be used "when complimenting a person on their mastery of the subject matter").

his lady." Just as no reasonable reader would interpret those captions as allegations of fact, no reasonable reader would interpret the photograph of the Knievels as a serious allegation of criminal wrongdoing.

**[11]** We acknowledge, like the district court did, that taken in isolation and given a literal interpretation, ESPN's suggestion that Evel is a pimp is "sufficiently factual to be susceptible of being proved true or false." *See Underwager*, 69 F.3d at 366. But we assess the meaning of the word in the context in which it was used. Because the caption cannot reasonably be interpreted literally in this context, the fact that its literal interpretation could be proven true or false is immaterial.

**[12]** The Knievels correctly point out that the fact that a statement is an attempt at humor does not immunize the speaker against liability for defamation. *See Polygram*, 216 Cal. Rptr. at 260 (holding that "the jocular intent of the publisher will not relieve him from liability if it is reasonable to not understand the utterance as a joke") (quoting *Arno v. Stewart*, 54 Cal. Rptr. 392, 397 (Ct. App. 1966)). They argue that notwithstanding ESPN's attempt at humor, the word "pimp" is by its very nature always an insult in a "proper law-abiding society."

> The writer of this appellate brief graduated from a pool hall he attended every day during his high school years and he most certainly did not lead a sheltered life across the tracks on the north side of his city. "Pimp" was an insult then and always has been in a proper law-abiding society.

But that argument, based entirely on the anecdotal childhood experience of the Knievels' lawyer, utterly fails to address the context in which the word appeared, and context can be dispositive as to whether or not a statement is actionable under the First Amendment. *See Koch*, 817 F.2d at 509 ("the context of a statement may control whether words were understood in

a defamatory sense"). Read in the context of the satirical, risque, and sophomoric slang found on the rest of the site, the word "pimp" cannot be reasonably interpreted as a criminal accusation.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

BEA, Circuit Judge, dissenting:

Shakespeare's Iago said it best:

> Good name in man and woman, dear my lord,
> Is the immediate jewel of their souls.
> Who steals my purse steals trash;
> 'Tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> But he that filches from me my good name
> Robs me of that which not enriches him,[1]
> And makes me poor indeed.

William Shakespeare, *Othello*, Act III, scene iii (1604).

With considerable less lilt than Iago, but with perhaps the same desire to poison the mind not of a Moor—but of millions—defendant ESPN wrote below a photograph of Knievel, his attractive wife and a younger woman: "Evel Knievel proves you are never too old to be a pimp."

In a classic example of *ipse dixit*, the Majority here con-

---

[1]Except in this case, where it *did* apparently enrich ESPN insofar as ESPN received free publicity at the expense of Knievel.

cludes that no reasonable person could view that photo of Evel and Krystal Knievel, and the unidentified young woman, captioned with the phrase quoted, and believe a longtime daredevil now seeks money by living less on motorcycles and more off of women. Because I believe that a reasonable person could view this photo and its caption as defamatory of the Knievels, I respectfully dissent.

# I

## A. *Defamation, Constitutional Limitations and Pleading Requirements*

To make out a case for defamation under Montana law,[2] a plaintiff must prove: "(1) that the published material was false; (2) that defendants are chargeable with fault in the publication; (3) that actual injury to [plaintiff] ensued for which he may recover his actual damages; and (4) [ ] that the publication was made by defendants with knowledge of its falsity or in reckless disregard for the truth or falsities thereof." *Madison v. Yunker*, 180 Mont. 54, 67, 589 P.2d 126, 132 (1978).

Courts have held that, to comport with the First Amendment, only statements that can "reasonably be interpreted to state actual facts about an individual" are capable of defamatory meaning and are therefore actionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (internal quotation marks and citations omitted); *see also Cochran v. New York Post*, 58 F. Supp. 2d 1113, 1121 (C.D. Cal. 1998) (noting that "the threshold question is whether a reasonable fact finder could conclude that the statement is sufficiently factual to be susceptible of being proved true or false").

A court may properly determine "whether a statement is fairly susceptible of a defamatory meaning when presented

---

[2]I agree with the majority that diversity jurisdiction exists. 28 U.S.C. § 1332. *See* Majority Op. at III.A.

with a motion to dismiss." *Cochran*, 58 F. Supp. 2d at 1120. In general, however, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis added). Moreover, the court must read the complaint generously and draw all reasonable inferences in favor of the plaintiff, accepting the complaint's allegations as true. *See id.* at 46.

Accordingly, a court's power at the pleading stage to hold that a statement is not defamatory *as a matter of law* is limited. "It is only when the court can say that the publication is not reasonably capable of *any* defamatory meaning and cannot be reasonably understood in *any* defamatory sense that it can rule as a matter of law, that it was not libelous." *McBride v. Merrell Dow & Pharmaceuticals Inc.*, 717 F.2d 1460, 1465 (D.C. Cir. 1983) (emphasis added). *See also Condit v. National Enquirer, Inc.*, 248 F. Supp. 2d 945, 964 (E.D. Cal. 2002) ("[a]ssuming, *arguendo*, there are non-defamatory readings of the [allegedly defamatory] word 'attacks'[ ], all that the law requires is that the headline is reasonably susceptible to *one defamatory meaning*") (emphasis added); *Kaelin v. Globe Communications Corp*, 162 F.3d 1036, 1040 (9th Cir. 1998) ("[s]o long as the publication is reasonably susceptible of *a defamatory meaning,* a factual question for the jury exists") (emphasis added).

Here, the Knievels' complaint alleges general and special damages — including an allegation that plaintiff was dropped by former clients who have seen the photograph and caption. *See* Knievel Complaint ¶ 6, p. 7. Accordingly, the Knievels argue that the photo and caption here are "capable of defamatory meaning" and is therefore actionable.

## B.  *Ninth Circuit Three-Part Test*

Under Ninth Circuit caselaw, to determine whether a statement is capable of defamatory meaning, we use the following three-part test:

[t]o determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made. First, we look at the statement in its broad context, which includes the general tenor of the work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager*, 69 F.3d at 366 (following *Partington*, 56 F.3d at 1153 and *Unelko*, 912 F.2d at 1051).

Prior to application of the three-part test, the preliminary question is "whether a *reasonable factfinder* could conclude that the contested statement implies an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990) (emphasis added); *see also Norse v. Henry Holt & Co.*, 991 F.2d 563, 567 (9th Cir. 1993) ("[t]o determine whether the statement has a defamatory meaning, [courts] interpret it from the standpoint of the average reader").

The "average reader" is a "reasonable factfinder," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) ("[t]he dispositive question in the present case then becomes whether *a reasonable factfinder* could conclude that the statements . . . imply an assertion that petitioner Milkovich perjured himself"). Put another way, the "average reader" is a "reasonable juror." *Cochran*, 58 F. Supp. 2d at 1121 (statement is defamatory if "*a reasonable juror* could conclude that the allegedly defamatory implications constituted provably false assertions of fact") (emphasis added).

The issue is not "whether *the court* regards the language as libelous, but whether it is *reasonably susceptible* of such a

construction." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (emphasis added). Indeed, "[t]his court may not . . . interfere with the jury's role by treating as nondefamatory a statement that a reasonable juror may fairly read in context as defamatory." *Sharon v. Time, Inc.*, 575 F. Supp. 1162, 1165 (S.D.N.Y. 1983).

In determining whether the "reasonable juror" would find a particular statement defamatory, courts have held that "words charged to be defamatory are to be taken in their natural meaning and that the courts will not strain to interpret them in their mildest and most inoffensive sense to hold them nonlibelous." *Mencher v. Chesley*, 297 N.Y. 94, 99 (1947); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002) (a court must "place itself in the position of the . . . reader, and determine the sense of meaning of the statement according to its natural and popular construction" and the "natural and probable effect [it would have] upon the mind of the average reader").

Moreover, if the language at issue is "capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for the jury." *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 449 (3d Cir. 1987). *See also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 363 (S.D.N.Y. 1998) ("[i]f the statement complained of is susceptible of more than one meaning, at least one of which is defamatory, the claim must go to the jury").

For example, applying the three-part test in *Underwager*, we have held that a reasonable factfinder could conclude that a statement made in the context of a satirical television program implied an assertion of objective fact. In *Unelko Corp. v. Rooney*, a manufacturer of rain-repellant windshield glass coating "Rain-X" brought a defamation action against television personality who stated on television program that the product "didn't work." The defendant, Andy Rooney, moved for summary judgment. The district court granted summary

judgment on the ground that none of Rooney's statements were capable of defamatory meaning. We reversed and held that "the tenor of Rooney's segment notwithstanding, the statement 'it didn't work' could reasonably be viewed as implying an assertion of objective fact." In so holding, this court reasoned that:

> [t]he tenor of Rooney's segment notwithstanding, the statement 'it didn't work' could reasonably be viewed as implying an assertion of objective fact. *The humorous and satirical nature of Rooney's segment of '60 minutes' does not negate the impression that he was making a factual assertion about [the product's] performance when applied to his vehicles.* Although part of a humorous report, the statement 'it didn't work' was presented as fact and understood as fact by several viewers who wrote to CBS.[3] The humor in Rooney's statement about [the product] is derived not from hyperbole or exaggeration, but from the fact that his report of the product's effectiveness was the antithesis of what its inventor presumably desired. *Rooney's negative evaluation of [the product's] capabilities differs significantly from his personal assessment of the other items he received in the mail; thus it receives no protection based on the overall tenor of his '60 minutes' segment.*

*Unelko*, 912 F.2d at 1054 (emphasis added).

---

[3]Here, the Knievels allege several clients who saw defendants' web site, believed the slur and cancelled Mr. Knievel's contracts. *See* Knievel Complaint at ¶ 6, p. 7.

**II**

**A.**  *Application of the Test to the Photo and Caption*

Here, while the Majority correctly states the Ninth Circuit's three-part test, it incorrectly applies the test to the properly pleaded facts in the present complaint.

**1.**  *First Prong: Broad Context*

Under *Underwager*, the court first looks at the broad context in which the statement appears: "the general tenor of the work, the subject of the statements, the setting, and the format of the work." *Underwager*, 69 F.3d at 366.

The "broad context" here is correctly stated: the website on which the photo and caption at issue appear, EXPN.com, and the specific photo gallery (termed the "Green Carpet Gallery") with the caption "EXPN style." *See* Majority Op. at III.B.2. Here, the Majority concludes that when viewed in the broad context of the website on which the photo and caption at issue appear, the statement is not reasonably susceptible of defamatory meaning. *See* Majority Op. at III.B.2.

To determine whether a statement is defamatory, courts should first look at the publication in which the statement appears. For example, in *Falwell v. Flynt*, 805 F.2d 484, 484 (4th Cir. 1986), minister Jerry Falwell sued Larry Flynt, proprietor of Hustler Magazine, for libel, invasion of privacy and intentional infliction of emotional distress as a result of the magazine's running an advertisement depicting Falwell having sex with his mother in an outhouse. At the close of the evidence, the court dismissed plaintiff's claim for invasion of privacy. The jury rendered a verdict for the defendants on the libel claim, on the ground that "no reasonable man would believe that the parody was describing actual facts about Falwell." *Falwell*, 797 F.2d 1270, 1273 (4th Cir. 1986), *overruled on other grounds, Hustler Magazine v. Falwell*, 485

U.S. 46 (1988). There were several grounds upon which the jury could have so concluded. For example: (1) the ad appeared in a satirical pornographic magazine; (2) the ad was inherently unbelievable insofar as Falwell was a religious minister; and (3) at the bottom of the page is a disclaimer which states: "*Ad parody — not to be taken seriously*" and the parody is listed in the table of contents as "*Fiction; Ad and Personality Parody*." *Id.* at 1272 (emphasis added).

Unlike the ad parody published in *Hustler* magazine in the *Falwell* case, here the EXPN website is not an overtly non-factual, satirical publication,[4] nor does ESPN contend that it is. Here, there was nothing to suggest satire. ESPN was not holding up the "vices" of anyone to "ridicule or contempt," the function of satire. Second, it is not inherently unbelievable that a daredevil attract, and perhaps exploit, women. Last, there has not been a semblance of a disclaimer, then or now.

Second, in analyzing the broad context in which the photo and caption appear, the Majority's analysis of the "broad context" was erroneously narrowed by its acceptance of defendant's argument that to determine "broad context" all that matters is *to whom* the publication is targeted. The district court erroneously concluded that:

> [the] language used [in the caption] make[s] it obvious that the target audience is teenagers and young adults who are likely to use many of the terms on the website in everyday conversation" and "[t]he website was directed at a younger audience.[5]

---

[4] *See also Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193 (9th Cir. 1989) ("the appearance of the language in a magazine known for its pornographic content robs the statements of defamatory meaning") (internal citations omitted).

[5] There is no evidence in the record to support the district court's conclusion that the targeted audience is likely to use many of the terms in the website in everyday conversation. Nor can judicial notice be taken, had it

*Knievel v. ESPN, Inc.*, 223 F.Supp. 2d 1173, 1180-1181 (D. Mont. 2002). The Majority erroneously follows suit. *See* Majority Op. at III.B.2 ("[t]he content of the EXPN.com main page is lighthearted, jocular, and intended for a youthful audience").

Since the EXPN.com event and website are targeted at the hip, young and irreverent who revel in slang and do not take statements "seriously," the Majority reasons "no harm, no foul." However, the case law does not allow a court to judge whether a statement is defamatory by asking who was *intended* to read or hear it. The true test is "who *did* read or hear it." The general law of defamation is that a publisher is liable for the unintended results of his publication. *See Tomaso v. Pan American*, 235 Cal. Rptr. 292 (1987). Moreover, as even the Majority acknowledges, the jocular intent of the speaker does not insulate him from liability. *See Polygram Records, Inc. v. Superior Court*, 216 Cal. Rptr. 252, 257 (Ct. App. 1985) ("jocular intent of the publisher will not relieve him from liability if it is reasonable not to understand the

been requested (which it was not) that youngsters call each other "pimps" in a jocular and light-hearted manner, rather than to provoke street corner fights. But even if we were to accept the stereotype of youth the Majority shares with the district court, neither consider a stereotype of other possible viewers: the more aged, the adolescents brought up in traditional or religious families, where modesty and decency are core values; the persons active in gender equity activities who greatly resent the power inequality which exists between pimps and prostitutes. One could go on. The point is the district court and the Majority have closed the door to consideration of the audience that makes up the "reasonable person" standard by which to judge the credibility of the statement, after positing a single stereotype: the "trash-talking" adolescent the alleged defamer claims to have targeted. Somewhat inconsistently, the Majority nevertheless inveighs against the anecdotal evidence offered by Knievel's attorney regarding the definition of the term "pimp." *See* Majority Op. at III.B.2. The function of the court at this pleading stage is not to choose between the versions to find what is credible; it is to determine whether plaintiffs' submission is conceivably credible.

utterance as a joke”); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 987 (9th Cir. 2002) (rejecting the argument that allegedly “humorous” language was protected where “the colorful and humorous language [defendant] used [ ] did not negate the impression that [defendant] was seriously maintaining [plaintiff] committed [the act]”).

On this issue, the Majority’s focus of claimed “broad context” is, quite simply, not broad enough. One should include not only the audience ESPN claims, and the court accepts, as the one targeted. What about those dowdy corporate bourgeois who are Knievel’s clients and who allegedly have abandoned him because of the photograph and caption? Put another way, one cannot judge the liability of a defamer by the composition of what he claims is his targeted audience. One also has to consider not only who was *targeted*, but who was *hit*.

## 2.   *Second Prong: Specific Context*

We next analyze the specific context in which the statement was made, including “the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.” *Underwager*, 69 F.3d at 366.

In analyzing the specific context in which the defamatory statement appeared, courts will examine the type of language used both in the allegedly defamatory statement, and in nearby statements. This usually involves examination and comparison of specific phrases and words. *See Cochran*, 58 F. Supp. 2d at 1123-25; *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (considering examples of phrases broadcast in TV program to determine that negative statements about psychologist were opinion not fact); *Standing Comm. on Discipline of U.S.D.C. for the C.D. Cal. v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (considering specific context of “string of colorful adjectives” to determine that word “dishonest” was not factual assertion); *Horsley v.*

*Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (examining specific context by comparing defendant's statements with plaintiff's, where allegedly defamatory statement was made during television talk show appearance).

We have recognized that "[e]ven in contexts in which the general tenor of the work suggests that the author is expressing personal opinions, it is possible that a particular statement of opinion may imply a false assertion of objective fact and therefore fall outside the scope of the First Amendment's protection." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995); *Standing Committee on Discipline of the United States District Court for the Central District of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) (per Kozinksi, J.).

Here, the Majority concludes that when viewed in the specific context of a photo gallery (the "Green Carpet Gallery") in which there were other photos and captions that included so-called "jocular phrases," the statement about Knievel was merely "loose, figurative and hyperbolic" and therefore not actionable. The Majority concludes:

> [t]he overwhelming presence of slang and non-literal language guides our inquiry. The web pages immediately preceding and following the Knievel photo use slang words such as "hardcore" and "scoping" and slang phrases such as "throwing down a pose," "put a few back" and "hottie of the year," none of which were intended to be interpreted literally . . . .

Majority Op. at III.B.2.

Accordingly, the Majority concludes "[w]e think that any reasonable viewer would have interpreted the word 'pimp' in the same loose, figurative sense as well." Majority Op. at III.B.2. In reaching this dubious conclusion, the court articulates two principle rationales: (1) "pimp" has a "slang" meaning as well as a common meaning; thus, the slang meaning

excludes the common meaning; and (2) no reasonable person could view the photo and caption and believe that Knievel was a pimp and the women with him were whores. Both are incorrect.

a. *Slang v. Dictionary Definition of Term "Pimp"*

The Majority concludes that the definition of the word assigned by Plaintiffs is not the *only* definition and therefore that the term is not capable of defamatory meaning. *See* Majority Op. at III.B.2. Rather, the Majority reasons, in slang commonly used today, calling someone a pimp is not necessarily an insult and can be a compliment. *See* Majority Op. at III.B.2. & n. 8 ("[t]oday [pimp is] a very ambiguous term, used either as a compliment or an insult towards a male. In its positive form, it means that the person is 'cool.' In its negative form, it insults their attitudes, clothing, or general behavior").

This analysis is a classic example of circular reasoning. To conclude that the slang definition is the correct reference point is to decide the issue. Not so fast. Even were the hip usage—a sharp-dressing dude—*widespread*, even ESPN does not claim such meaning is *unanimous* amongst "average persons." *Norse v. Holt & Co.*, 991 F.2d at 567. That is as it should be, since "pimp's" pejorative meaning made it into *Webster's Collegiate Dictionary*, but not Appellees' hip offering nor, with respect, the Majority's application of the term.[6]

---

[6]According to *Webster's Collegiate Dictionary* (Tenth Edition), "pimp" is defined as: "Pimp. *n* [origin unknown] (1600): a man who solicits clients for a prostitute." *See also Oxford English Dictionary* (Second Edition): "*Subject* [Origin obscure] a. One who provides means and opportunity for unlawful sexual intercourse; a pander, procurer." *Webster's New International* (Second Edition): "n. 1. A procurer, pander." *American Heritage Dictionary of the English Language* (Third Edition): "Pimp, *n.* One who finds customers for a prostitute; a procurer." "Pimp, n. a go-between in illicit sexual affairs; especially, a prostitute's agent; a pander."

As noted above, courts can look at *any* reasonable construction of a word to determine whether its use was defamatory. *See Flowers v. Carville*, 310 F.3d 1118, 1127-28 (9th Cir. 2002) (Kozinski, J.). For example, in *Flowers*, the court held that a statement by a presidential candidate's campaign aide that plaintiff had "doctored" documents was capable of defamatory meaning where a dictionary definition provided that "doctor" is a crime. The court reasoned:

> [d]efendants argue that "doctor" can also be used in a neutral sense; *Webster's* does define it alternatively as "to adapt or modify for a desired end by alteration or special treatment," as in "[doctored] the play by tightening its whole structure and abridging the last act." *Id.* We doubt, though, that anyone would understand the statement in this sense — just as we doubt that anyone would assume Flowers "doctored" the tapes by nursing them back to health. At the very least, it isn't the only reasonable construction; if a statement is "susceptible of different constructions, one of which is defamatory, resolution of the ambiguity is a question of fact for the jury."

*Flowers,* 310 F.3d at 1127-28 (internal citations omitted). All the more here. In *Flowers*, a non-defamatory meaning of "doctor" had made its way into Webster's. A non-defamatory meaning—indeed any other meaning—of "pimp" has yet to do so. Even so, the use of allegedly "slang" language does not negate the fact that the statement is susceptible to different constructions — both of which are *reasonable*.

Indeed, in a recent case, the California Court of Appeals held that the term "pimp," allegedly used "in jest" was reasonably capable of defamatory meaning. *See Hughes v. Hughes*, 122 Cal. App. 4th 931 (Sept. 28, 2004). In *Hughes*, the plaintiff alleged that he was defamed by his sons' statement, published in the *Vanity Fair* magazine, that "[o]ur dad's a pimp." *Id.* at 934. The court concluded that the term "pimp"

was capable of defamatory meaning and the case was properly tried to a jury. In so holding, the court noted that "the dictionary definition of pimp is a man who solicits clients for a prostitute" and reasoned that, "[s]o long as the statement 'our dad's a pimp' can reasonably be understood to mean that plaintiff had at one time engaged in pimping activity, it was for the jury to determine if that is how the statement should be understood." *Id.* at 936-937 (citing *Merriam-Webster Online Dictionary* (2004) at <www.Merriam-Webster.com>).[7]

### b.   *"Loose, Figurative or Hyperbolic" Language*

The Majority next reasons that the term "pimp" is "loose, figurative or hyperbolic" language and is therefore not capable of defamatory meaning. *See* Majority Op. at III.B.2. Not so.

First, there is nothing "loose, figurative or hyperbolic" about the term "pimp." The noun describes criminal activity in Montana,[8] and should be especially loathsome to the "hip"

---

[7]Alas, for plaintiff Hughes, in California, truth is still a defense. *See Hughes v. Hughes*, 122 Cal. App. 4th 931 (Sept. 28, 2004) (plaintiff alleged that statement "our dad's a pimp" was defamatory; defendants contended that truth was a defense under California law; by special verdict, the jury held that defendants did not defame plaintiff; plaintiff appealed on the ground that, *inter alia*, the evidence in support of the verdict was insufficient and the court gave an erroneous jury instruction; California Court of Appeal affirmed, holding that evidence of past and present actions was sufficient and relevant to a determination of whether the allegedly defamatory statement was true and the jury was properly instructed). But note, Hughes got a trial; his complaint was not dismissed.

[8]*See* MONT. CODE ANN. § 45-5-602(1)(e) ("[a] person commits the [felony] offense of promoting prostitution if the person purposely or knowingly . . . procures a prostitute for a patron"). Moreover, procuring a prostitute is illegal in Nevada where the photograph was taken. *See* NEV. STAT. ANN. § § 201.300(1)(a), (f) *et seq.* ("[a] person who: (a) [i]nduces, persuades, encourages, inveigles, entices or compels a person to become a prostitute or to continue to engage in prostitution . . . (f) [r]eceives, gives or agrees to receive or give any money or thing of value for procuring or attempting to procure a person to become a prostitute or to come into this state for the purpose of prostitution is guilty of pandering").

who sometimes espouse political correctness, for it connotes despicable sexist conduct of domination and exploitation.

Second, the terms used to describe the other individuals ESPN displayed in the photo gallery implicitly allude to an individual's promiscuity ("share the love"; "hottie"), conceit and self-centeredness ("throwing down a pose"), drinking prowess ("put a few back"), attitude ("hardcore") and general hipness ("give a shout out to EXPN"). Slang is used to describe being left alone, greeting someone or drinking beer. These terms are aptly deemed "loose, figurative and hyperbolic" phrases.

On the other hand, the description of Knievel is unique. While all the others are described in terms implying fun-filled misconduct of one sort or another, *only Knievel* was described as a *criminal,* per dictionary definition. For example, the promiscuous women are called "hotties", not "whores" or "sluts"; the beer-drinkers are not called "public drunks." None of the other terms describes *any* criminal activity, much less the loathsome anti-feminist characteristics of a "pimp."

The "loose, figurative and hyperbolic" language used to describe the other individuals actually highlights the fact that while all others are described as sexy, hip and with-it, the hard, factual description of plaintiff as a *criminal* and abuser of women is reserved for Knievel. Courts have recognized that "[s]tatements that could reasonably be understood as imputing specific criminal or other wrongful acts are not entitled to constitutional protection merely because they are phrased in the form of an opinion." *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (statement that judge was "drunk on the bench" was actionable and not mere rhetorical hyperbole).

It may well be that some people reading the web site take "pimp" to be a commendation indicating "cool," but that is not what the complaint has alleged, nor what the district court

found to be a reasonable interpretation (before that interpretation was massaged by tendentious interpretations of "context"). *See Knievel v. ESPN, Inc.,* 223 F. Supp. 2d 1173, 1180 & n. 1 (D. Mont. 2002) (concluding that "[t]he Court concludes that use of the term pimp is capable of the meaning prescribed by Plaintiffs: that Evel and Krystal Knievel were involved in criminal activity involving prostitution").

Is it so "unreasonable" to conceive of an executive of a certain age, concerned with his market share of "average person" consumers, believing that a reputed daredevil has decided to supplement his income by living off "his ladies," a couple of which are shown in the photo? Again, so long as *a* reasonable interpretation is defamatory, plaintiff has stated a claim for relief. *See Kaelin*, 162 F.3d at 1040.

### 3. *Third Prong: Susceptibility of Being Proven True or False*

Finally, under the Ninth Circuit's three-part test, the court must determine whether the "statement itself is sufficiently factual to be susceptible of being proved true or false." *Underwager*, 69 F.3d at 366.

This is the strongest element in favor of plaintiff. Whether one is a "hottie" may depend upon who is saying it, and, perhaps, his recognized expertise in identifying "hotties." One man's "hottie" may be another's "dog." It may depend against whom one is being compared. Different speakers can mean different things by that term. Similarly, "hardcore." These are relative adjectives defining subjective attitudes of sexual prowess or promiscuity and attitude.

In contradistinction, "pimp" has a literal dictionary definition that is clearly susceptible of being proven true or false. The Majority eludes this inconvenient fact when it ignores the dictionary definition and simply takes the "slang" definition of "pimp" as the *only* usage which the law allows. It is uncon-

troverted that, in the *literal* sense of the word, the term pimp "is sufficiently factual to be susceptible to being proved true or false." Majority Op. at III.B.2. However, the Majority assumes that the question is whether the *slang* usage of "pimp" is capable of being proven true or false. Not surprisingly, the Majority concludes it is not. It seems equally plausible that, when used in the slang sense, the term "pimp" is irreducibly subjective and not capable of being proved true or false. However, the Majority's analysis begs the question by impermissibly reducing the possible meaning of "pimp" from common usage to slang. Moreover, the Majority's reasoning is contrary to the caselaw: the issue is whether an "average person" *in the community* (not just the slang users) would consider the term "pimp" defamatory.

## III

The fundamental principle of First Amendment law is to facilitate the search for truth by encouraging "uninhibited, robust and wide open" public debate. *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). One can agree that "public debate [must] not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Falwell*, 485 U.S. at 53-55.

However, in my view, the word "pimp" is reasonably susceptible to a defamatory meaning. Were the court to hold that the district court erred in denying the defendant's motion to dismiss, it would do no more than decide that the complaint presents an issue of fact for a jury to decide.[9] In my view, it

---

[9]Or perhaps, the court would dismiss on motion for summary judgment, were the defendant to establish, by evidence, and beyond material triable issues of fact, all of the factual premises upon which the Majority here relies: (1) the only audience that saw the show were adolescents; (2) all such adolescents are so hip they understand only the slang usage of "pimp"; (3) all such adolescents use "pimp" in exclusively jocular and light-hearted exchanges. Perhaps the defendant could establish all these foundational facts, but one tends to doubt a broadcaster would hazard representing to its advertisers such a restricted audience.

is not for us to say that the publication "did not hurt the plaintiffs by tending to deprive them of friendly association with a considerable number of respectable members of their community." *Mencher*, 297 N.Y. at 102. Rather, I believe "it is the right of the plaintiffs to *have a jury say* whether the false words did, in fact, so defame them." *Id.* (emphasis added).

Accordingly, I respectfully dissent.