**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM O. GILLEY ENTERPRISES,
INC., a Nevada corporation doing
business in California and the
estate of William O. Gilley,
deceased; DENNIS DECOTA, an
individual; PATRICK PALMER, an
individual on behalf of themselves
and all others similarly situated,
                    *Plaintiffs-Appellants,*

v.

ATLANTIC RICHFIELD COMPANY;
CHEVRON CORPORATION; EXXON
CORPORATION; MOBIL OIL
CORPORATION; EXXON/MOBIL
CORPORATION; SHELL OIL COMPANY;
TEXACO INC.; TOSCO CORPORATION;
ULTRAMAR DIAMOND SHAMROCK;
VALERO CORPORATION; CONOCO-
PHILIPS PETROLEUM CORPORATION;
CHEVRON/TEXACO CORPORATION;
TESORO CORPORATION,
                    *Defendants-Appellees.*

No. 06-56059

D.C. No.
CV-98-0132-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
February 13, 2008—Pasadena, California

Filed April 3, 2009

4013

Before: Stephen S. Trott, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Trott;
Dissent by Judge Callahan

**COUNSEL**

Charles M. Kagay, Spiegel, Liao & Kagay LLP, San Francisco, California, for the plaintiffs-appellants.

Timothy D. Cohelan, Cohelan & Khoury, San Diego, California, for the plaintiffs-appellants.

Hojoon Hwang, Munger, Tolles & Olson LLP, San Francisco, California, for the defendants-appellees.

Peter H. Mason, Fulbright & Jaworski LLP, Los Angeles, California, for the defendant-appellee.

David M. Foster, Fulbright & Jaworski LLP, Washington DC, for the defendant-appellee.

## OPINION

TROTT, Circuit Judge:

The district court granted Defendants' motion to dismiss Plaintiffs' antitrust claim founded on § 1 of the Sherman Act, holding that 1) *Aguilar v. Atlantic Richfield Co.*, 24 P.3d 493 (Cal. 2001), precludes the allegations made in the operative pleading; 2) Defendants' exchange agreements can not be aggregated to establish market power and anticompetitive effect; and 3) even if the exchange agreements could be aggregated, the absence of a conspiracy to limit supply and raise prices eliminates a causal connection between the exchange agreements and anticompetitive effect. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

## I

## BACKGROUND

Plaintiff-Appellant William O. Gilley filed this class-action lawsuit in 1998 on behalf of himself and other wholesale purchasers of CARB gasoline in the state of California. CARB

gas is a cleaner-burning fuel, and since 1996 it is the only type of gas that can be sold in California. The complaint alleged that Defendants-Appellees, major oil producers, violated § 1 of the Sherman Act by entering into a conspiracy to limit the supply of CARB gasoline and to raise prices.

The allegations of the complaint were similar to those alleged in *Aguilar*, a class-action suit filed in California Superior Court in 1996. That suit was brought under the Cartwright Act, CAL. BUS. & PROF. CODE § 16720 et seq., California's equivalent to the Sherman Act. *Aguilar*, 24 P.3d at 502. The plaintiff in *Aguilar* was a retail purchaser and consumer of gasoline and sought to represent a class of retail purchasers. The plaintiff in this action was a wholesale purchaser and retail dealer of gasoline and sought to represent a class of wholesale purchasers. Both plaintiffs were represented by the same attorneys, and both actions targeted the same defendants for essentially the same allegedly unlawful conduct. Because of the similarity in the cases, the district court hearing this case stayed the suit pending the outcome of *Aguilar*.

In *Aguliar*, the state superior court granted summary judgment to the defendants, concluding that there was insufficient evidence presented by the plaintiffs to allow a reasonable juror to find a conspiracy to limit supply and raise prices among the several gasoline companies. *Id.* at 503. The California Supreme Court affirmed. *Id.* at 521. As a result, Defendants in this case brought a motion for summary judgment arguing that Gilley's claims were barred by collateral estoppel. In response, Gilley offered a proposed amended complaint, which the court found insufficient. The district court, however, granted Gilley leave to provide another proposed amended complaint, which he did.

On May 6, 2002, the district court granted Defendants' motion for summary judgment on that complaint, holding that Gilley was precluded by *Aguilar* from relitigating whether a conspiracy existed to limit supply and raise prices. However,

the court granted Gilley further leave to amend the complaint to allege that "each of the bilateral agreements, entered into independently between various defendant gasoline companies, ha[s] anti-competitive effects and therefore violate[s] the Sherman Act."

On May 24, 2002, Gilley filed the third post-*Aguilar* complaint, alleging that forty-four bilateral exchange agreements had the effect of unreasonably restraining trade in violation of § 1 of the Sherman Act and in violation of CAL. BUS. & PROF. CODE § 17200. On March 27, 2003, the district court granted Defendants' motion to dismiss that complaint with prejudice. With respect to the § 1 claim, the court explained that Gilley had not alleged any theory as to how any individual exchange agreement, which accounts for a small percentage of the relevant market, is able to inflate the price of CARB gasoline. The district court rejected Gilley's argument that the court could consider the aggregate effects of the individual bilateral agreements to allege an anticompetitive effect—namely higher gas prices.

Gilley appealed to this Court, which reversed and remanded, holding that the district court erred in not giving Gilley an opportunity to correct the newly identified deficiencies. After the remand, the second amended complaint ("SAC") was filed. Most of the allegations of anticompetitive conduct and effect are stated in the following terms:

> [Defendant] entered into the following sales/ exchange agreements for delivery of CARB gas in [geographic market]: [list of exchange agreements.]

> [Defendant's] intent and purpose in entering into these sales/exchange agreements was to limit refining capacity for CARB gas and/or to keep CARB gas out of the spot market and away from unbranded marketers.

These agreements have had the effect of raising CARB gas prices in [geographic market] above competitive levels, without any countervailing procompetitive benefit.

The district court granted Defendants' motion to dismiss the SAC, holding that Plaintiffs failed to allege that the exchange agreements, when considered individually, would be capable of producing significant anticompetitive effects. We now review the district court's summary dismissal of the SAC.

## II

## DISCUSSION

### A.   Standard of Review

We review de novo a dismissal for failure to state a claim pursuant to Rule 12(b)(6). *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). All allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Id.*

### B.   Analysis

We address the following issues in this appeal: 1) the preclusive effect of the California Supreme Court's decision in *Aguilar*; 2) the pleading standard for § 1 claims; 3) the sufficiency of Plaintiffs' SAC; 4) Plaintiffs' standing to add Tesoro as a Defendant in the SAC; and 5) the state law claim under CAL. BUS. & PROF. CODE § 17200.

#### 1.   The Preclusive Effect of the California Supreme Court's *Aguilar* Decision.

Gilley does not dispute that the decision in *Aguilar* has some preclusive effect in the current lawsuit, but he contends

that his current claim is not entirely extinguished by *Aguilar*. In contrast, Defendants argue that all of the allegations in the SAC are precluded by *Aguilar*. We conclude that Gilley has stated a claim that is not precluded by the California Supreme Court's decision.

**[1]** The critical determination in *Aguilar* was that the plaintiff failed to provide sufficient proof of a fact necessary for the claim she had pled, specifically that Defendants conspired and acted collectively through exchange agreements to fix prices and/or control supply. As the California Supreme Court explained: "Aguilar had to present evidence that tended to exclude the possibility that the petroleum companies acted independently rather than collusively. This she did not do." *Aguilar*, 24 P.3d at 518. In the order granting Defendants' motion to dismiss, the district court in this case summarized its understanding of that finding: "With respect to exchange agreements specifically, the court found that the evidence showed independent action on the part of the petroleum companies rather than a collusive web of bilateral exchange agreements to control supply and prices." The district court, applying the doctrine of issue preclusion (or collateral estoppel), accepted as an established fact the finding that the defendants did not collude to control supply and prices through the exchange agreements.

The California Supreme Court was clear in *Aguilar*, however, that the failure to prove that fact did not necessarily mean that plaintiff did not have a legally viable claim against Defendants:

> In alleging facts for her Cartwright Act cause of action, Aguilar proceeded on a theory, which was legally sound, that the assertedly unlawful conspiracy consisted of an agreement among the petroleum companies as competitors to restrict the output of CARB gasoline and to raise its price, and was unlawful per se without regard to any of its effects.

> In granting the petroleum companies summary judg-
> ment, the superior court did so on that theory. On
> appeal, Aguilar apparently attempted to introduce an
> alternative theory, which was also legally sound, that
> the assertedly unlawful conspiracy consisted of the
> various exchange agreements entered into by the
> various petroleum companies, and was unlawful
> because of its effects. The Court of Appeal rejected
> any such attempt as too late. To the extent that Agui-
> lar makes the same attempt on review, we reject it
> for the same reason.

*Id.* at 521, n. 35 (citations omitted). Plaintiff was not allowed to proceed with the alternative theory based on the effects of the exchange agreements, without proof of collusion, because the theory had not been timely pleaded, not because it was held to be defective, either legally or factually.

The *Aguilar* decision does not preclude the latter theory in subsequent litigation. Issue preclusion is decided under the law of the state where judgment was entered. *Ross v. Alaska*, 189 F.3d 1107, 1110 (9th Cir. 1999). Under California law, issue preclusion applies only if a number of conditions are satisfied. *Calvert v. Huckins*, 109 F.3d 636, 638 (9th Cir. 1997). Among those conditions are "[the] issue must have been actually litigated in the former proceeding" and "the decision in the former proceeding must be final and on the merits." *Id.*

**[2]** *Aguilar* precludes a claim that depends upon proof of collusion by Defendants to use exchange agreements to con-trol supply and prices, notably in the form of a per se claim of a horizontal price-fixing conspiracy,[1] but it does not pre-

---

[1]The determination of whether an agreement unreasonably restrains trade can be based upon per se condemnation or under a rule of reason analysis. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5-7 (2006) (noting that a per se claim and a rule of reason claim are distinct). Courts will con-

clude a claim that the bilateral exchange agreements have an anticompetitive effect on competition, despite the absence of collusion, under the rule of reason.[2]

[3] The SAC may include allegations which are precluded by *Aguilar*, but not of all of what the SAC alleges is precluded. To the extent that the SAC alleges a claim that Defendants have entered into exchange agreements, without a conspiracy to control supply or to set prices, and that those agreements aggregated together have an anticompetitive effect on competition in the relevant market, it has stated a claim that is not precluded by *Aguilar*.

## 2.    The Pleading Standard for § 1 Claims.

To successfully state a claim under § 1 of the Sherman Act, a plaintiff need only meet the notice pleading standard articulated in Fed. R. Civ. P. 8(a)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. at 1964 (2007). Rule 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that

demn as per se illegal only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). For example, "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements," are condemned as per se illegal. *Dagher*, 547 U.S. at 5.

[2]For a rule of reason claim, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

a recovery is very remote and unlikely.' " *Id.* at 1965. Additionally, dismissals for failure to state a claim are disfavored in antitrust actions. *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir. 1983).

### 3.    The SAC is a Sufficient Pleading.

[4] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. However, it has long been recognized that Congress did not intend to give literal meaning to those words, but instead only intended to make unlawful *unreasonable* restraints on trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Therefore, "to establish a claim under § 1 of the Sherman Act, the plaintiff must show 1) that there was a contract, combination, or conspiracy; 2) that . . . unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce."[3] *Bhan*, 929 F.2d at 1410.

### a.    The First Element—Existence of an Agreement.

Under the first element of a § 1 claim, a plaintiff must plead the existence of a contract, combination, or conspiracy, meaning a defendant did not operate unilaterally, but instead, at least two entities acted in concert. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Defendants argue that the exchange agreements are not concerted action.

[5] "Our antitrust law is clear that [a plaintiff] need not prove intent to control prices or destroy competition to demonstrate the element of an agreement . . . among two or more

---

[3]Neither party disputes that the exchange agreements affect interstate commerce.

entities." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir. 2003) (internal quotation marks omitted) (noting that intent of the parties is to be evaluated under the second element of the § 1 analysis). The exchange agreements are "contracts." As a result, each bilateral exchange agreement, even without intent to control prices, provides an agreement that meets the first element of a § 1 Sherman Act claim.

### b. The Second Element—When Aggregated, the Exchange Agreements Unreasonably Restrain Trade.

Under the second element of a § 1 claim, a plaintiff must show the challenged agreement unreasonably restrains trade by establishing anticompetitive effects. *Bhan*, 929 F.2d at 1410. To make this showing under the rule of reason analysis, a plaintiff generally must establish market power. *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 951 (9th Cir. 1998). "Market power is the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.38 (1984).

Because each of the exchange agreements arguably affects only a small amount of CARB gas, Plaintiffs pleaded the cumulative effect of a single Defendant's exchange agreements to show market power and anticompetitive effect.

[6] Plaintiffs argue correctly that the district court erred in not allowing them to allege the cumulative effects of a single Defendant's exchange agreements. They find support in Ninth Circuit and United States Supreme Court precedent, which has allowed the aggregation of multiple contracts when evaluating the legality of an individual contract. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982); *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495 (1969); *Standard Oil Co. of Cal. & Standard*

*Stations, Inc., v. United States*, 337 U.S. 293 (1949); *cf.* 2 AREEDA & HOVENKAMP ¶ 310c1, p. 201 ("An aggregation of claims may produce sufficient proof of violation or injury where violation requires that a certain legal threshold be met and no claim standing alone is sufficient to meet the threshold.").

In *Twin City*, we were presented with the issue of "whether a district court, in assessing the antitrust liability of a defendant, may look to the overall effects of a defendant's conduct in the relevant market, or is limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant." 676 F.2d at 1302. We allowed aggregation, reasoning that a defendant who restrains trade by an obvious pattern and practice of entering into individual contracts should not be allowed to do piecemeal what he would be prohibited from doing all at once. *Id.* We held that, "[c]reating such a distinction would require courts to enforce arguably innocuous single contracts that belong to a pattern of contractual relations that significantly restrain trade in a relevant market." *Id.* at 1303.

**[7]** The district court and Defendants concede that aggregation of agreements is appropriate in some cases. Both, however, contend that aggregation should be allowed only in the context of "exclusive dealing" and "tying" cases because of the predictably anticompetitive effect of those practices—market foreclosure to competitors. The district court reasoned that only those types of contracts can be aggregated because they have "a clear purpose and an identifiable effect" and because "[d]etermining the cumulative effect of such contracts can be done with relative ease." We disagree, as no general rule requires that only the easiest cases may be aggregated. As noted by the California Supreme Court, plaintiffs have a viable legal theory. *See Aguilar*, 24 P.3d at 521 n.35 (noting an "alternative theory, which [is] also legally sound, that the assertedly unlawful conspiracy consisted of the various exchange agreements entered into by the various

petroleum companies, and was unlawful because of its effects") (citation omitted).

At the stage of a motion to dismiss for failure to state a claim, it is not our role to determine the soundness of Plaintiffs' economic theory. Even if we, as a savvy court, view actual proof of the facts pleaded in the SAC as improbable and conclude that a recovery is remote and unlikely, the complaint should still proceed. *Bell Atl. Corp.*, 127 S. Ct. at 1965. The analysis we would have to undertake to dismiss the complaint here is not appropriate at the Rule 12 stage.[4]

Defendants also argue that bilateral exchange agreements, in general, are an efficiency-enhancing distribution practice that promotes, not hinders, competition. The allegations contained in the SAC, however, are that *these exchange agreements have anticompetitive effects*.

That exchange agreements like "exclusive dealing" and "tying" arrangements, may be efficiency-enhancing and thus procompetitive does not necessarily mean that the anticompetitive effects of those types of arrangements or agreements are *always outweighed* by procompetitive justifications. *See Brown v. Hansen Publ'ns, Inc.*, 556 F.2d 969, 971 (9th Cir. 1977) (noting that "exclusive dealing" contracts may be procompetitive); *NCAA*, 468 U.S. at 104 n.26 (noting that "tying" arrangements may be procompetitive).

This loggerhead is precisely what a rule of reason analysis would address. The formulation of the dispute at issue was long ago laid out. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 244 (1918). This point

---

[4]We note that the decision in *Aguilar* concerned a summary judgment, not a dismissal for failure to state a claim.

of contention is yet another reason to allow the complaint to proceed.

Defendants offer a number of other arguments against aggregation. None of the arguments, however, can sidestep our precedent.

Defendants argue that Plaintiffs waived the aggregation argument by not challenging the district court's Order Granting Leave to Amend in their first appeal to the Ninth Circuit. That order reads, "The court GRANTS leave to amend plaintiff's complaint only to the extent that it alleges that each of the bilateral agreements, entered into independently between various defendant gasoline companies, have unreasonable anti-competitive effects and therefore violate the Sherman Act." The purpose behind the district court's decision to grant leave to amend was so Plaintiffs could plead a claim different than the per se violation pled in *Aguilar*. Plaintiffs complied by pleading a rule of reason claim based on the aggregate effects of the exchange agreements.

Defendants also argue also that *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), forecloses aggregation of the bilateral exchange agreements to establish a violation of § 1. In that case the plaintiff "alleged discrete conspiracies between Microsoft and two original equipment manufactures (OEMs): Dell and Compaq. *Id.* at 210." The Fourth Circuit affirmed the district court's determination "that it could not consider the cumulative harm of Microsoft's agreements with *all OEMs* but instead was required to consider—individually—Microsoft's agreements with Compaq and Dell" because the complaint "did not allege a conspiracy among Microsoft and *all OEMs*; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell." *Id.* (emphases added). In other words, because the plaintiff did not allege the cumulative effect of Microsoft's agreements with "all OEMs" in the complaint, the Fourth Circuit declined considering their aggregate effects. *Dickson* is distinguishable from the present

case, as the plaintiffs here do expressly allege that each Defendant's agreements considered in the aggregate have anticompetitive effects.

Defendants also contend that aggregation would subject firms to unwarranted liability and great uncertainty regarding the validity of independent business dealings that do not carry inherent anticompetitive potential. Section 1 liability, however, is directed not only at inherent anticompetitive conduct, but also at conduct that has *anticompetitive effects*. *Khan*, 522 U.S. at 10. Furthermore, aggregation of the agreements does not lessen a plaintiff's burden of demonstrating anticompetitive effects of a given agreement.

[8] Because the district court's application of the law was incorrect, and because we reject Defendants' arguments against aggregation, we conclude that the district court erred in not allowing Plaintiffs to aggregate the agreements to demonstrate their anticompetitive effects.

### c. The Allegations in the SAC Are Not Necessarily Premised on a Conspiracy to Limit Supply and Raise Prices.

[9] The district court concluded that, even if aggregation were proper, the complaint alleges the existence of a network of exchange agreements that allow Defendants to limit supply and raise the price of CARB gas. The district court based that conclusion on language of the complaint stating that each Defendant obtained market power "through the use of [the Defendant's] exchange agreements, coupled with its own refining capacity and that of its contracting partners." However, that language says nothing more than the exchange agreements provide access to refining capacity of Defendant's competitors through the exchange agreements themselves. Furthermore, that language, read in the light most favorable to Plaintiffs, *Knievel*, 393 F.3d at 1072, certainly does not plead a "network", a "precise dance of give-and-take", or any

other nomenclature for the operation of a conspiracy to limit supply or raise prices.

The district court concluded also that "Plaintiffs cannot avoid the fact that their Sherman Act claim is, at its core, a conspiracy claim." To come to that conclusion, the district court did not rely on the allegations made in the SAC. Instead, the court, in effect, probed the soundness of Gilley's economic theory, concluding that the alleged anticompetitive effects could not result without the intentional collusion precluded, as a factual allegation, by *Aguilar*. The district court illustrated its analysis with a hypothetical:

> Defendant A enters into separate exchange agreements with B, C, D, E, and F. If B overproduces CARB gasoline at some point in time, A may be able to take the excess amount and adjust its production accordingly. However, in the absence of a conspiracy, C, D, E, and F may also produce excess CARB gasoline which cannot be absorbed by A because A has already taken the overproduction from B.

The district court may be correct in its understanding of how the economy or the oil business works, but that is a factual assessment, not left to the court, even a savvy judge, to decide on a Rule 12 motion. The hypothetical is not what has been pled in the SAC. The SAC alleges that anticompetitive effects have resulted from the exchange agreement, even in the absence of collusion, and under Rule 12(b)(6), allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Knievel*, 393 F.3d at 1072.

**[10]** A review of the SAC shows that it alleged that the existence of the exchange agreements allows a given Defendant in a given geographic market control of enough refining capacity of CARB gas to keep CARB gas out of the spot market and away from unbranded marketers, with the overall *effect* of creating supracompetitive prices. Plaintiffs did not

allege that Defendants entered into a conspiracy to limit supply or raise prices, and did not assert a conspiracy to enter into the exchange agreements. That the district court believes that the allegedly anticompetitive effects would not actually occur without a conspiracy does not justify dismissal of the SAC for failure to state a claim.

**[11]** Furthermore, the absence of a conspiracy to limit supply and raise prices does not eliminate a causal connection between the exchange agreements and anticompetitive effect. As discussed above, Plaintiffs must first identify an agreement that unreasonably restrains trade. Here, the SAC properly identifies a number of agreements satisfying the contract, combination, or conspiracy requirement of § 1. Next, Plaintiffs must plead facts that if taken as true would allow Plaintiffs to recover for an antitrust injury. Here, Plaintiffs' SAC, construed in the light most favorable to them, alleges that each Defendant's control of its refining capacity, coupled with that of its contracting partners, establishes requisite market power in the relevant geographic market sufficient to establish anticompetitive effects.

We conclude that the SAC is a sufficient pleading to move beyond Rule 12(b)(6).

### 4. Plaintiffs Have Standing Against Tesoro.

Although a plaintiff must directly purchase from a defendant to have standing to recover damages, *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977), an indirect purchaser may nevertheless have standing to seek injunctive relief. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998).

**[12]** Taking Plaintiffs' allegations as true, and construing them in the light most favorable to Plaintiffs, at least an indirect purchaser scenario exists in the SAC. In addition to Plaintiffs' allegations that they are "direct purchaser[s] from

[D]efendants," the allegation that Tesoro acquired the Avon refinery from UDS, and that "Tesoro entered into the same sales and/or exchange agreements that UDS had formerly entered into with other refiners . . . in connection with the ownership and operation of the Avon refinery" provides sufficient pleading to conclude that Plaintiffs have standing to include Tesoro in the SAC.

## 5.  We Remand the State Law Claim.

**[13]** The district court dismissed Plaintiffs' claim under CAL. BUS. & PROF. CODE § 17200 as follows:

> Plaintiffs' state unfair competition claim rests on the same facts as their Sherman Act claim. Because the Sherman Act claim is being dismissed at an early stage of litigation, the Court finds that the factors underlying the assertion of supplemental jurisdiction . . . weigh against retention of jurisdiction over the remaining state law claim.

Because we reverse the dismissal of the Sherman Act claims, we also reverse the district court's dismissal of the state law claim.

## III

## CONCLUSION

We agree with the California Supreme Court that the *Aguilar* trial court only adjudicated a per se claim of horizontal price fixing. Therefore, Plaintiffs' rule of reason claim alleging that the bilateral exchange agreements have anticompetitive effects is not precluded. In addition, Ninth Circuit and Supreme Court precedent allow for aggregation of the individual exchange agreements to demonstrate market power and anticompetitive effect in a given market. Though the district court may think the prospects of Gilley actually proving the

allegations contained in the SAC to be highly improbable—and may be correct in that assessment—that is not a valid basis for Rule 12 dismissal.

**REVERSED** and **REMANDED.**

---

CALLAHAN, Circuit Judge, dissenting:

I write separately because I think that the majority reads the California Supreme Court's opinion in *Aguilar v. Atl. Richfield Co.*, 24 P.3d 493 (Cal. 2001), too narrowly and fails to appreciate the pleading standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). When Gilley's Second Amended Complaint (sometimes referred to as "SAC") is viewed in light of these cases, it is too broad and amorphous and fails to limit his claims to those that are not precluded by *Aguilar*. Furthermore, because Gilley has been on notice since 2002 that his complaint must be limited to those claims not precluded by *Aguilar*, has had several opportunities to submit a properly circumscribed amended complaint, and has failed to do so, I would affirm the district court's dismissal of the Second Amended Complaint.

**I**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has clearly established that the section is limited to prohibiting unreasonable restraints of trade. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Whether a plaintiff pursues a per se claim or a rule of reason claim under § 1, the first requirement is to allege a "contract, combination in the form of trust or otherwise, or conspiracy."

I agree with the majority that the core of the plaintiff's claims in *Aguilar* was a per se claim based on an alleged

unlawful conspiracy among petroleum companies. I also agree that the California Supreme Court in *Aguilar* recognized that plaintiffs "attempted to introduce an alternative theory, which was also legally sound [ ], that the assertedly unlawful conspiracy consisted of the various exchange agreements entered into by the various petroleum companies, and was unlawful because of its effects." *Aguilar*, 24 P.3d at 521, n.35. The California Supreme Court agreed with the Court of Appeal that this attempt came too late and rejected it for that reason. *Id.*

The California Supreme Court's opinion in *Aguilar*, however, is broader than the footnote referenced by the majority. The *Aguilar* opinion goes on to state:

> Just as the superior court's order granting the petroleum companies summary judgment was not erroneous as to Aguilar's primary cause of action for an unlawful conspiracy under section 1 of the Cartwright Act to restrict the output of CARB gasoline and to raise its price, neither was it erroneous as to her derivative cause of action, which was for an unlawful conspiracy under the unfair competition law for the same purpose.
>
> . . .
>
> The petroleum companies carried their burden of persuasion to show that there was no triable issue of material fact and that they were entitled to judgment as a matter of law as to Aguilar's unfair competition law cause of action. They did so by doing so as to her Cartwright Act cause of action. Again, they carried their burden of production to make a prima facie showing of the absence of any conspiracy, but she did not carry her shifted burden of production to make a prima facie showing of the presence of an unlawful one.

It is true, as Aguilar argues, that her unfair competition law cause of action is not based on allegations asserting a conspiracy *unlawful under the Cartwright Act.* But it is indeed based on allegations asserting a *conspiracy,* specifically, one unlawful at least under the unfair competition law itself. As stated, the petroleum companies showed that there was no triable issue of the material fact of conspiracy. Aguilar claims that conspiracy is not an element of an unfair competition law cause of action in the abstract as a matter of law. Correctly so. (See Bus. & Prof. Code, § 17200). But she simply cannot deny that conspiracy is indeed a component of the unfair competition law cause of action *in this case as a matter of fact.*

*Id.* at 521 (emphasis in original).

This portion of *Aguilar* holds that the plaintiffs had failed to demonstrate the existence of a conspiracy that was per se illegal or otherwise illegal under the Sherman Act. With this understanding, if Gilley were not asserting that the defendants entered into a conspiracy in violation of the Sherman Act, I could agree with the majority that "a claim that Defendants have entered into exchange agreements, without a conspiracy to control supply or to set prices," would state a claim that is not precluded by *Aguilar.* However, even assuming that in the abstract the Second Amended Complaint can be interpreted as alleging such a limited claim, it clearly alleges much more than that and it is far too late in the litigation process to presume that this is anything but intentional.

## II

The preclusive effect of *Aguilar* is woven through the numerous court decisions in Gilley's federal action. Gilley filed this class action in 1998, and its proceedings were stayed pending the outcome of *Aguilar.* After the California Supreme Court issued its opinion in *Aguilar*, the defendants filed a

motion for summary judgment. Gilley opposed the motion and also offered to file an amended complaint. The district court granted the motion for summary judgment. The district court held that pursuant to the doctrine of issue preclusion, Gilley was barred from relitigating the conspiracy alleged in *Aguilar*. The court denied Gilley's request to amend the complaint to allege continuing violations of antitrust laws subsequent to the time period involved in *Aguilar*, reasoning:

> The exchange agreements were already judged by the California Supreme Court not to be evidence of a conspiracy. The court finds that the proposed amended complaint merely alleges the ongoing use of these supply agreements and not any new conduct. Issue preclusion therefore bars Gilley from relitigating whether use of the ongoing agreements constitute an illegal conspiracy under the Sherman Act.

The district court, however, agreed with Gilley that "his rule-of-reason claim has not been litigated to the extent that he is alleging that the individual bilateral exchange agreements violate the anti-trust laws due to their anti-competitive effect." Accordingly, it granted Gilley leave to file an amended complaint "only to the extent that it alleges that each of the bilateral agreements, entered into independently between various defendant gasoline companies, have unreasonable anti-competitive effects and therefore violate the Sherman Act."

Gilley amended his complaint. Defendants responded by filing a motion to dismiss the First Amended Complaint ("FAC"). The district court granted the motion, explaining:

> After careful scrutiny of the FAC, the court has been unable to discern any allegation that any of the parties in any of the bilateral agreements entered these agreements with an unlawful intent or purpose to

restrain competition. In the few instances that Plaintiff does allege an improper purpose, he does so by alleging joint action among all, or substantially all of the defendants. As discussed below, Plaintiff's pleading of such joint purpose or action regarding the various defendants is improper and will not be considered by the court. Therefore, Plaintiff has failed to properly allege "concerted action" regarding any individual bilateral exchange agreement.

The district court dismissed the case with prejudice, commenting that because "Plaintiff was already granted leave to amend his complaint previously, and at this late date was unable to set forth a valid anti-trust claim, it appears that Plaintiff cannot allege sufficient facts constituting a valid § 1 claim."

Gilley appealed, and we reversed and remanded to allow Gilley an opportunity to file a further amended complaint. We held that the district court had abused its discretion by denying Gilley an opportunity to amend his complaint.

When Gilley filed a Second Amended Complaint, defendants again moved to dismiss, and the district court granted the motion. It explained:

Plaintiffs do not allege that each exchange agreement has a discrete effect on competition which can be viewed together with the separate effects of the other exchange agreements. Instead, Plaintiffs allege the existence of a network of exchange agreements that allow Defendants to coordinate their production and output, thereby limiting the amount of CARB gasoline on the rack or spot market and allowing Defendants to raise prices to branded dealers.

Even if a single defendant and all of the defendants who contracted with that defendant cumulatively had

sufficient market power to substantially impair competition, Plaintiffs would need to make the further showing that all of these defendants worked together through the use of the exchange agreements and strategic shutdowns or decreased production to stabilize the spot market and avoid the depression of gasoline prices. . . .

Plaintiffs cannot avoid the fact that their Sherman Act claim is, at its core, a conspiracy claim. Plaintiffs' theory of recovery rests upon the existence of a web of exchange agreements that allegedly allows all of the Defendants to engage in a precise dance of give-and-take with the goal of maintaining the delicate balance of CARB production. Coordinated action is essential to Plaintiffs' claim.

After four attempts to plead around a conspiracy claim, Plaintiffs still fail to allege that the bilateral exchange agreements, *viewed independently*, constitute an unreasonable restraint on trade. Plaintiffs' inability to establish a causal connection between the individual exchange agreements, and anticompetitive harm is fatal to Plaintiffs' Sherman Act claim.

A critical aspect of the district court's perspective is its determination that the SAC does not allege "that each exchange agreement has a discrete effect on competition which can be viewed together with the separate effects of other exchange agreements." Rather, the district court sees the SAC as alleging "a network of exchange agreements" that "allow Defendants to coordinate their production and output." In essence, the district court reads the SAC as not alleging that the bilateral agreements "violate the anti-trust laws due to their anti competitive effect," but rather that the agreements facilitate coordinated action by the defendants that unlawfully restrains trade.

This distinction is critical. If the bilateral agreements in themselves have an illegal effect on competition (when aggregated), then the bilateral agreements constitute the "contract, combination or conspiracy" required for a claim under § 1 of the Sherman Act. If, however, the bilateral agreements only facilitate coordinated activity, then to maintain a claim under § 1 of the Sherman Act, Gilley must show some meeting of the minds, some "contract, combination or conspiracy," between those defendants whom Gilley alleges coordinated their actions. Although a plaintiff might well be able to do so in the abstract, here, Gilley is precluded by *Aguilar* from asserting that the defendants so conspired.

## III

The Second Amended Complaint implicitly, if not explicitly, asserts a conspiracy. The charging paragraphs of the SAC describe the defendants' parallel actions and imply the existence of a conspiracy. The SAC asserts:

> California's CARB gas supply is generally manufactured primarily by defendants, California branded refiners, who are engaged in the business of refining, distributing and selling almost 100% of the CARB gas in the state of California during the class period. California remains largely isolated from external sources of supply.

> All California refiners, now also major retail marketers, control supply and pricing from production to distribution, in part, through supply agreements that require dealers to purchase gasoline exclusively at each branded refiner's present DTW price, a price that is always greater than the rack price and cost of distribution.

> California refiners' weekly refinery production decisions are influenced by, among other things, spot

price impact, refiner margins, bilateral exchange partners' market needs, ability to draw inventory from bilateral exchange partners, and overall market supply.

With the impending introduction of CARB gasoline in 1996, each of the defendants or their predecessors in interest, entered into new sales and/or exchange agreements with other defendants, many of which provided for the provision of CARB gas "as mutually agreed" (AMA) with no minimum or maximum.

The determination that these paragraphs assert a conspiracy is reinforced by the next paragraph of the SAC which reads:

The sales and exchange agreements known to plaintiffs that are subject of this action are listed on the attached Exhibit . . . . On information and belief, plaintiffs allege that defendants have entered into other sales and exchange agreements, presently unknown to plaintiffs, with similar intent and effect.

Certainly the tenor of this paragraph is that the "similar intent and effect" violates antitrust laws. Moreover, in light of the preceding paragraphs and the failure to assert any other specific violation of the Sherman Act, the alleged violation must be one of conspiracy or collusion.

This allegation of conspiracy is carried forward in the SAC's allegations against particular defendants, starting with Chevron.[1] It lists three exchange agreements that Chevron entered into with Exxon, Shell, and Tosco Refining Co., and alleges, on information and belief, that Chevron has entered

---

[1]The allegations against the other defendants are similar to the allegations against Chevron.

similar agreements "for the delivery of CARB in Northern California." The SAC then alleges:

> Chevron's intent and purpose in entering into these exchange agreements was to limit refining capacity for CARB gas and/or to keep CARB gas out of the spot market and away from unbranded marketers.

> Through the use of these exchange agreements, **coupled with its own refining capacity and that of its contracting partners**, Chevron has obtained sufficient market power to limit the supply of CARB gas to unbranded marketers and to raise the price at which it sells CARB gas in Northern California to supracompetitive levels. These agreements have had the effect of raising CARB gas prices in Northern California above competitive levels, without any countervailing procompetitive benefit.

(Emphasis added).

These paragraphs reveal, as the majority notes, how Gilley proposes to meet the market power requirement for a claim under § 1 of the Sherman Act, but they leave the reader uninformed as to how the individual exchange agreements allegedly violated the Sherman Act "without a conspiracy to control supply or to set prices." In his brief, Gilley responds by pointing to the paragraphs concerning the relationship between Chevron and Tosco. These paragraphs set forth various reasons for why the defendants purportedly entered into particular agreements,[2] suggest an industry-wide conspiracy,[3]

---

[2]For example, the SAC sets forth a 1994 individual exchange agreement between Chevron and Tosco and alleges:

> Chevron's intent and purpose in entering into this agreement with Tosco was to place its surplus CARB gas with other branded

and assert that the individual agreements facilitated a combination or conspiracy.[4] Again, the paragraphs seem to allege a conspiracy. They certainly do not clearly allege that the exchange agreements themselves constitute a restraint of trade or suggest why the defendants' actions were "collusive, rather than independent, action." *See Aguilar*, 24 P.3d at 519.

In sum, the SAC, fairly read, is not limited to alleging that the bilateral exchange agreements are themselves restraints of trade. Instead, its broad allegations encompass conspiracy claims that are precluded by *Aguilar*. Indeed, the majority so concludes when it states "[t]he SAC may include allegations which are precluded by *Aguilar*, but not of all of what the SAC alleges is precluded."

---

refiners to maximize returns. Chevron intended to and did rearrange its CARB gas supply to avoid a market imbalance caused by CARB gas flowing to independent marketers.

If Chevron and Tosco agreed to restrain the production of gas, the individual exchange agreement might well be a contract to restrain trade pursuant to § 1 of the Sherman Act. The paragraph, however, does not say that the parties agreed. Instead, it only addresses Chevron's intent and purpose. This purpose and intent would presumably motivate Chevron to act independently or interdependently without any agreement as to purpose or intent with Tosco.

[3]For example, the SAC alleges that "[t]hrough the use of these exchange agreements, coupled with its own refining capacity and that of its contracting partners, Chevron has obtained sufficient market power to limit the supply of CARB gas to unbranded marketers and to raise the price at which it sells CARB gas." This implies a conspiracy and does not allege that there was a meeting of the minds of the parties to any of the individual exchange agreements to raise the price of gasoline.

[4]For example, the SAC alleges that "Tosco's intent and purpose in entering into this agreement with Chevron was [to] join the 'club' of major branded refiners and to give Chevron the opportunity to place its surplus CARB gas with other branded refiners to maximize returns." This is confusing, as it indicates that Tosco's intent was to give Chevron "the opportunity" to maximize its return. This seems to suggest that the individual exchange agreement facilitated, but did not in itself provide for, the maximization of Chevron's return.

## IV

It is this breadth of the SAC that concerns me as it is inconsistent with the spirit of *Twombly*, 127 S. Ct. 1955. Although *Twombly* involved an alleged conspiracy based on parallel conduct and this case is ostensibly not a conspiracy case, nonetheless the Supreme Court's concerns reverberate in this case. The Supreme Court reiterated that Federal Rule of Civil Procedure 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Twombly*, 127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).[5] It commented that a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" and that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 (internal citations omitted). The Supreme Court reaffirmed its earlier decisions holding that "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people with the right to do so representing an *in terrorem* increment of the settlement value," and that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the

---

[5]The Court went on to disapprove the language in *Conley* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46). The Court held that:

> [t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.

*Twombly*, 127 S. Ct. at 1969.

court." *Id.* at 1966 (internal quotation marks and citations omitted). The Court concluded that allegations of parallel conduct in themselves do not provide a sufficient basis to sustain a conspiracy claim.[6]

Similarly, in this case the district court read the complaint as not stating a viable cause of action. It determined that the SAC did not allege that "each exchange agreement has a discrete effect on competition which can be viewed together with the separate effects of other exchange agreements," but rather as alleging "the existence of a network of exchange agreements that allow Defendants to coordinate their production and output." I agree with the district court. I read the SAC as not asserting that the bilateral agreements, in themselves, restrain trade, but that they facilitate or make it easier for the defendants to coordinate their actions to restrain trade.[7] The

---

[6]The Court noted:

> We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, . . . there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

127 S. Ct. at 1971.

[7]The district court explained:

> Even if a single defendant and all of the defendants who contracted with that defendant cumulatively had sufficient market

majority seems to admit that the SAC includes allegations of conspiracy, but contends that the SAC must be allowed because it can also be read to allege only that each exchange agreement has a discrete effect on competition. This is the type of "*in terrorem* increment of the settlement value" that the Supreme Court mentioned in *Twombly*. *Id.* at 1966. Moreover, when viewed in the light of the preclusive effect of *Aguilar*, the SAC "does not raise a claim of entitlement to relief." *Id.*

Furthermore, there can be little doubt that the broad scope of the SAC was intentional. Gilley has known since 2002 that following *Aguilar*, he was precluded from alleging a conspiracy. Nonetheless, he has thrice been given the opportunity to amend his complaint to limit it to a claim based solely on the alleged anti-competitive effect of the individual exchange agreements absent a conspiracy, and has thrice proffered amended complaints that continue to assert, albeit ever more subtly, the existence of a conspiracy. I do not necessarily quarrel with the majority that it might be possible for Gilley to allege an antitrust claim limited to issues that are not precluded by *Aguilar*, but he has declined to do so. Accordingly, the district court properly struck the SAC. Furthermore, the district court's denial of leave to amend does not appear to me to have been an abuse of discretion.[8]

---

power to substantially impair competition, Plaintiffs would need to make the further showing that all of these defendants worked together through the use of the exchange agreements and strategic shutdowns or decreased production to stabilize the spot market and avoid the depression of gasoline prices. . . .

[8]In *Griggs v. Pace Amn. Group, Inc.,* 170 F.3d 877, 880 (9th Cir. 1999), we held that the "district court determines the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." Generally, "this determination should be performed with all inferences in favor of granting the motion." *Id.* Nonetheless, "we have noted that a district court does not abuse its discretion in denying a motion to amend a complaint . . . when the movant presented no new facts but only new theories and provided no

# V

Although much of what the majority has to say about aggregation may be correct, I do not think that aggregation cures the defects in the SAC. Initially, I note that in an oligopoly, aggregation cannot be as broad as alleged in the SAC. More importantly, aggregation, which addresses the second prong of a § 1 claim, cannot overcome the SAC's failure to adequately identify the agreements that allegedly violate the Sherman Act.

In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982), we addressed the question of aggregation on a claim for an unreasonable restraint of trade under § 1 of the Sherman Act. We held:

> the issue is whether a district court, in assessing the antitrust liability of a defendant, may look to the overall effects of a defendant's conduct in the relevant market, or is limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant. At least in the factual context of the instant litigation, we think the district court correctly assessed Sportservice's aggregate pattern of conduct in the relevant market.

I agree with the majority that pursuant to *Twin City*, Gilley may aggregate the contracts entered into by each defendant in determining that defendant's marketpower. The allegations in the SAC, however, are not so limited. Rather, they appear to

satisfactory explanation for his failure to fully develop his contentions originally." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (quoting *Vincent v. Trend W. Technical Corp.,* 828 F.2d 563, 570-71 (9th Cir.1987)) (internal quotation marks omitted). Here, assuming that Gilley could, in the abstract, amend his complaint to state a claim that is not precluded by *Aguilar*, his repeated failure to do just that suggests that it would be futile to offer him another chance to do so.

allow the aggregation of all the bilateral agreements by all of the defendants. I know of no authority or reason that would allow such an aggregation, as it would include the entire market. Accordingly, I think that Gilley is limited to aggregating, for example, Chevron's contracts with Exxon, Shell and Tosco, in asserting that Chevron has sufficient market power to effect the price of CARB gasoline, and may not include in the calculation of Chevron's alleged market share any bilateral agreements entered into by Exxon, Shell or Tosco with any party other than Chevron.

Whatever the proper scope of aggregation, and accepting that the aggregation of each defendant's bilateral agreements gave each defendant sufficient market power to affect the price of gasoline, the SAC still fails to meet the first requirement for a § 1 claim — an allegation of a meeting of the defendants' minds. *See Twombly*, 127 S. Ct. at 1965. *Twin City* does not help Gilley on this issue. There, Sportservice had a practice of entering into exclusive concessionaire contracts, which were in themselves agreements to restrain trade. The only question was whether Sportservice had sufficient market power. Here, because the SAC does not clearly allege that the individual exchange agreements inherently restrain trade, the aggregation of Chevron's individual agreements might show market power, but it would not meet the requirement that Gilley assert an agreement to restrain trade.

The majority's over-reliance on aggregation may be seen in its conclusion that the SAC alleges "that the existence of the exchange agreements allows a given Defendant in a given geographic market control of enough refining capacity of CARB gas to keep CARB gas out of the spot market and away from unbranded marketers, with the overall *effect* of creating supracompetitive prices." This conclusion allows effect to take the place of intent in precisely the way that the Supreme Court criticized in *Twombly*, 127 S. Ct. at 1971.

"Spot market" is defined in the SAC as "a market for short-term bulk gasoline purchases," and "unbranded marketers"

refer to "jobbers and dealers who sell unbranded product not associated with the name brand of a branded refiner such as the defendants herein." These definitions indicate that "spot markets" exist only when a refiner produces more gasoline than can be sold by its "branded dealers." It follows that because "spot markets" produce a lower return to the refiner of gasoline than the refiner obtains through branded dealers, spot markets are a result of inefficiencies on the part of refiners. Accordingly, even without any collusion, a refiner is strongly motivated to avoid having to sell gasoline in the spot markets. Thus, a narrow focus on effect as a result of aggregation would convert self-interest parallel action, similar to that found to be legal in *Twombly*, into an antitrust violation, even when the plaintiff is precluded from showing any agreement between the competing businesses.

## VI.    Conclusion

We recently reiterated in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), that "[t]o state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce . . . (3) which actually injures competition." Gilley, in order to state a § 1 claim, must plead "a contract . . . by which the persons or entities intended to harm or restrain trade." Despite its length and detail, the SAC does not clearly assert which individual agreement or agreements constitute in themselves a "contract . . . by which the persons or entities intended to harm or restrain trade." Rather, the SAC is fairly read as alleging the existence of a network of exchange agreements that arguably allowed the defendants to unlawfully coordinate their production and output. But given the preclusive effect of *Aguilar*, Gilley cannot show such coordination. The SAC is not saved by the argument that it could be read to encompass a claim that the

individual agreements in themselves constitute a restraint of trade because the SAC does not provide the defendants fair notice of such a claim and the grounds upon which it rests. *See Twombly*, 127 S. Ct. at 1964. Moreover, aggregation does not save the SAC because it does not show that the defendants' adjustments of CARB production were part of any agreement or conspiracy, rather than independent efforts to maximize profits. *See Twombly*, 127 S. Ct. at 1971. Finally, I note that, as written, the SAC might allow Gilley to seek discovery on, and to assert, allegations of conspiracy that Gilley concedes he is precluded by *Aguilar* from asserting as a cause of action. For these reasons, I would affirm the district court's dismissal of the Second Amended Complaint without leave to amend.